### THE PEOPLE v. J. W. PETHERAM.[1]

*Criminal law—Conspiracy—Sufficiency of information—Evidence—Proof of malice.*

Respondent was informed against, jointly with three others, under How. Stat. § 9275, for *unlawfully* and *wickedly* conspiring to *willfully* and *maliciously* obstruct and impede the regular operation and conduct of the business of a manufacturing corporation, by acts and means of intimidation, to wit., assembling in the night-time, and entering upon the premises of the corporation, and obstructing the usual flow of water in its canal,—by means of which its mills and factories were operated,—and by force preventing the removal of such obstructions; the information further specifying the character of the same.

The proof showed that respondent, who was chief engineer of a railway company, which desired to rebuild a bridge over said canal and the adjacent river, in company with his co-respondents, and with a large force of men, took forcible possession of the property of the corporation. in the night-time, imprisoned its night watchman, and, after obstructing the flow of water into the canal, commenced constructing a coffer-dam therein to enable them to build a pier in the canal for the support of the proposed railroad bridge. It further appeared that the piers of the bridge then in use were located *outside* of the canal.

On the trial the court permitted proof to be made of the *overt* acts specified in the information, as acts done in furtherance of

---

[1] See *Newaygo Manufacturing Co. v. Chicago & W. M. Ry. Co., ante*, 114, for a full statement of the facts surrounding this case.

the alleged conspiracy, to which respondent objected, and introduced no testimony in his defense, claiming that the acts proven were not in violation of the statute upon which the information was laid.

In affirming the conviction the Court lay down the following propositions :

1. The information sets forth no overt acts as being done by respondents, but simply charges a conspiracy to obstruct and impede the business of the corporation by combining unlawfully to do so by certain acts and means described in the information, but not alleged to have been committed or used by respondents.

2. In setting out a conspiracy to do an *unlawful* act, the means to be resorted to in order to accomplish it need not be alleged (*People v. Clark*, 10 Mich. 310); such specific allegation only being required when the act to be done is *lawful*, and the offense consists in combining to do it in an *unlawful* manner. In such a case such allegation becomes important to show the *criminal* or *unlawful* purpose.

3. The information, without the overt acts referred to therein, shows a conspiracy to commit a single, statutory crime, and the enumeration of the *means* to be used in the furtherance of the conspiracy could have been treated as surplusage on the trial; but, if not, the admission of evidence of the enumerated acts, or of others not specified in the information, was not error.

4. The fact that the *object* of the conspiracy was *accomplished*, and the unlawful thing conspired to be done *performed*, does not prevent a conviction for *conspiring* to commit the act, the carrying of the conspiracy into effect not merging the offense *charged* into the *greater* one *proven*.

5. The acts of the respondents were unlawful, coupled with an obvious intent to accomplish their purpose in an unlawful manner, and with any force and intimidation necessary to secure the object in view.  Such conduct, even if the railway company had legally secured the right of way, and with it the right to place the piers in the canal, was reprehensible, and can find no favor in the courts. · The spectacle of corporations employing armed men, and, by *unlawful* force and intimidation, securing and enforcing their supposed rights, or redressing fancied wrongs, and disturbing, destroying, and interrupting private and public business, has become quite too frequent of late in our State, and such conduct needs punishment as well as rebuke.[1]

6. The statute in question does · not ˙require malice to be shown against the *owner* of the business disturbed, or his property, in

[1] See *T., A. A. & N. M. Ry. Co. v. D., L. & N. R. R. Co.*, 63 Mich. 645.

the same sense as required at common law in cases of malicious mischief, but was enacted to prevent and punish a course of proceeding not defined at the common law, and of comparatively recent origin. The offense consists in the *commission* of certain acts, or in *conspiring* to commit the same, and the *manner* of their commission may furnish, if unexplained, ·sufficient proof of the malice necessary under the statute, which need only be the *general* malice of the law of crime, to be proven in the same way as in other cases. The acts need not be inspired by any particular wantonness, cruelty, or revenge against the owner of the property, and may, as in other cases, furnish the presumption of malice.

·7. It is a general rule, governing the law of malice, that when a man commits an act, unaccompanied by any circumstances justifying such commission, the law presumes that he has acted advisedly, and with intent to produce the consequences which have ensued.

Error to Newaygo. (Fuller, J.) Argued June 23, 1886. Decided January 20, 1887.

Information for statutory conspiracy under "Baker Law," :so called. Respondent convicted. Conviction affirmed. The facts are stated in the opinion.

*Smith, Nims, Hoyt & Erwin,* for respondent.

*Moses Taggart,* Attorney General, and *George Luton,* Prosecuting Attorney of Newaygo county, for the People.

Morse, J. The respondent was tried and convicted upon the following information, duly verified:

"State of Michigan—The Circuit Court for the County of Newaygo.

" *Newaygo County—ss. :* George Luton, prosecuting attorney in and for the county of Newaygo, aforesaid, for and in behalf of the people of the State of Michigan, comes into said court, in the May term thereof, in the year one thousand eight hundred and eighty-six, and gives the court here to ·understand and be informed that heretofore, to wit, on the ·twenty-fourth day of January, 1886, at the village of Newaygo, in said county, J. W. Petheram, chief engineer, and Fred. ·Coleman, assistant engineer, and James McLaughlin, road-

master, of the Chicago & West Michigan Railway Company, and Adam McNabb, together with divers other persons whose names are unknown, to the number of seventy-five, being persons of evil minds and dispositions, did unlawfully and wickedly conspire, combine, confederate, and agree together willfully and maliciously to obstruct and impede the regular operation and conduct of the business of the Newaygo Manufacturing Company, a corporation organized under the laws of this State, to wit, the manufacture of lumber, pails, and tubs, flour and feed, by it then and theretofore carried on in said village of Newaygo, by acts and means of intimidation, to wit, by then and there assembling together in the night-time, and entering upon the premises of said corporation in said village, and obstructing the usual flow of water in the canal thereon, owned by it, and by means of which its said business was and had been so carried on, and by force and violence preventing the employés of said corporation from removing said obstructions, and thereby preventing the lowering of the water in said canal, and by causing a quantity of hay and other foreign material to float down said canal, and clog and obstruct the wheels used in propelling the machinery and mills and factory of said corporation in said village, which were then owned and operated by said corporation for the purpose aforesaid, against the form of the statute in such case made and provided, and against the peace and dignity of the people of the State of Michigan.

"GEORGE LUTON,

"Prosecuting Attorney."

There was no particular dispute as to the facts of the case. The respondent introduced no testimony in his defense; his counsel contenting themselves upon the trial with general objections against the whole case and theory of the people.

The respondent is the chief engineer of the Chicago & West Michigan Railway Company. This company had a railroad bridge over the Muskegon river, and a canal or mill-race of the Newaygo Manufacturing Company, in the village of Newaygo. The canal runs parallel with the river, and supplies the water that runs the machinery and mills of the Newaygo Manufacturing Company. This bridge was being repaired or rebuilt by the railway company. At midnight of Saturday, January 23, or the beginning of Sunday, January

24, 1886, Petheram, McNabb, and McLaughlin, with a large force of men, took possession of this canal, and commenced putting a coffer-dam therein for the purpose of stopping the flow of water, that they might construct piers in the canal for said bridge. Coleman and three others went to the night watchman of the Newaygo Manufacturing Company, and said:

"Well, Ed., to make a long story short, we will tell you what we came for. We came here to-night, with two or three hundred men, to shut the water out of the race and put in those coffer-dams. We came down to look after you, and to keep you from giving the alarm, and arousing the town, and causing trouble and a fight."

The night watchman said:

"You hadn't ought to keep me here. I've got trips to make, and stations to go to, and it wouldn't be right."

The men replied:

"Yes, that don't make any difference; we can take care of that all right; we have plenty of men in the yard to look after that. We have selected this time, and come prepared to do it, and are going to do it."

They kept him a prisoner until 6 o'clock in the morning. They obstructed the flow of the water in the canal, by putting in hay and boards at the head-gates, and removed the slash-boards at the foot of the canal, and by force prevented the men employed by the Newaygo Manufacturing Company from replacing such slash-boards. They also interfered with the wheels of the machinery of the mills, and thereby materially impeded their operation. These obstructions continued, and were maintained by force, until the following Tuesday. The hay and other materials used by them floated down into the wheels of the mill, and injured the machinery more or less.

The respondent, McNabb, and McLaughlin were the leading spirits in this enterprise, and were present most of the time, and were seen and heard giving orders, and directing

the men under them, apparently acting in concert, and having in view a common plan and purpose. The telephone communication between the mill and Mr. Clay, the president of the Newaygo Manufacturing Company, who resided at Grand Rapids, was obstructed by some one at the same time; the wires being disconnected, and the circuit broken.

The main objections are—

1. To the construction of the information, and the reception of evidence of certain overt acts under it by the court below.

2. That the acts proven were not in violation of the statute upon which the information was laid.

The information, in my opinion, sets forth no overt acts as being done by the defendant, Petheram, and the others impleaded with him. It must be construed strictly, as claimed by defendant's counsel; and, so construed, it was nothing more nor less than a charge of conspiracy to obstruct and impede the business of the Newaygo Manufacturing Company by combining unlawfully to do so by certain acts and means, describing them. It nowhere alleges that any of these acts were actually committed by the defendants, but that they conspired to commit them.

The court below, during the progress of the trial, and in his instructions to the jury, treated the enumeration of these acts and means, mentioned at the end of the information, as a distinct and specific charge of acts done under and in furtherance of the conspiracy set forth in such information; and the question arises whether this erroneous construction of the information resulted in any harm to the defendant sufficient to authorize this Court to grant him a new trial.

It is plain that the information charged only the offense of conspiracy under section 9275, which is given in full further along in this opinion. If the operation and legitimate con-

sequence of the action of the trial court had any tendency to damage the defendant, then he is entitled to a new trial. But I fail to discover any reason why the erroneous treatment of the information could have been of any harm to the respondent.

It is well settled that, in setting out a conspiracy to do an unlawful act, the pleader is not required to allege the means to be resorted to in order to accomplish such conspiracy. *People v. Clark,* 10 Mich. 310. It is only necessary to set forth the specific means to be employed when the act to be done itself is *lawful,* but the combination is to do it in an *unlawful* manner. The allegation of the means intended to be used then becomes important in order to show the criminal or unlawful purpose. *People v. Richards,* 1 Mich. 216; *State v. Crowley,* 41 Wis. 271; *People v. Barkelow,* 37 Mich. 455; *Com. v. Eastman,* 1 Cush. 190.

The information in this case, without the overt acts referred to therein, shows a conspiracy to commit a single statutory crime, as in the case of *People v. Clark,* 10 Mich. 310. See, also, *People v. Barkelow,* 37 Mich. 455. The enumeration of the means to be used in the furtherance of the conspiracy could have been treated as surplusage; and, whether so treated or not, I can find no error in admitting evidence of these acts enumerated, or of others not contained in the information, to show the existence of the conspiracy.

The act or acts of these parties, in concert, having a legitimate tendency to establish the fact of the conspiracy, were admissible; and the evidence given upon the trial was all of it, except, perhaps, the obstruction of the telephone communication, of acts and orders of Petheram, and at least two others of the indicted parties, while they were together, and manifestly in pursuance of a common purpose and understanding. The telephone matter was sufficiently taken care of by the judge in his charge. The fact that the object of the conspiracy was accomplished, and the unlawful thing

conspired to be done performed and completed, does not prevent a conviction upon the charge simply that the defendants conspired to commit the act. The carrying of the conspiracy into effect does not merge the offense charged into the greater, but, if the conspiracy to perform the unlawful act is proven, the conviction follows, though the defendant might have been found guilty of the greater crime had he been charged with it. 1 Bish. Crim. Law, §§ 804, 805, and cases cited.

As I understand the evidence, there is nothing to show that respondent acted under the orders or direction of any one, or that McLaughlin or McNabb acted entirely under his instructions. On the contrary, it clearly appears that respondent, McLaughlin, and McNabb moved in concert, and that each was busy giving orders of the same import, and in pursuance of a general plan, to the men there with them. It is true that these three men were servants of the railroad company, but there is no proof whatever tending to show that they were acting under orders from the railroad company, or any one else, or even that their conduct was sanctioned by such company.

They put in no testimony in their defense, and the evidence against them simply showed their acts, and the acts of others in obedience to their orders; the action of each tending and looking towards a common object and purpose. In the view of the case as it appears to me upon a careful examination of the record, these men were working together with the determination of accomplishing the primary object aimed at, to wit, the building of piers in the canal of the Newaygo Manufacturing Company at all hazards, and regardless of the consequences to the business of the Newaygo Manufacturing Company; and there is nothing to show but that they were free moral agents in what they did. And, if there was any leader in the enterprise among the three heretofore mentioned, it was the respondent.

I therefore find no warrant in the testimony for discussing the point that McLaughlin and McNabb could not be guilty of conspiracy if acting under the orders of respondent, who was placed over them by the railroad company, whose servants they were, and therefore, as one man alone cannot be guilty of a conspiracy, the respondent could not be convicted unless he conspired with some one else, and should have been acquitted.   The evidence fails to show respondent acting under the orders of the railroad company, or McLaughlin or McNabb acting under his direction alone.   All conspiracies have a leader in the planning and executing of the acts leading to the unlawful object; but, when the participation therein is voluntary, the guilt is none the less because the others were directed by him in some or even all of their movements.

It is not material that the other men on the ground were innocent of any conspiracy, and simply, as laborers, obeyed the orders of respondent, McLaughlin, and McNabb.

It is intimated that the record shows that the railroad company had a right of way over the canal and premises of the Newaygo Manufacturing Company, and that "it is at least open to question whether it would not include such changes in the structure [of the bridge] and its supports as should be found desirable or proper."

The record does tend to show a bridge heretofore constructed over the canal and upon the premises of the Newaygo Manufacturing Company, but there is no proof of the extent or character of that right of way.   It certainly appears, however, that the old bridge was not supported by any piers built within the canal, or in anywise encroaching upon it. And the fact that operations to build the piers commenced at the first breath of Sunday, without notice to the Newaygo Manufacturing Company, and that the night watchman was made a prisoner, that he might not alarm that company or

the community, does not tend very strongly to support even the theory that the defendants supposed they had any such right.

The acts of the respondent and the others were unlawful, and in violation of law, coupled with an obvious intent to accomplish their purpose in an unlawful manner, and with any force and intimidation that might be found necessary to complete the object in view. Such conduct, even if the railroad company had legally secured the right of way, and with it the right to place these piers in the canal, was reprehensible, and can find no favor in the courts. The spectacle of corporations employing armed men, and, by unlawful force and intimidation, securing and enforcing their supposed rights, or redressing fancied wrongs, disturbing, destroying, and interrupting private and public business, has become quite too frequent of late in our State, and such conduct needs punishment as well as rebuke.

I pass no opinion upon the question whether the conduct of these defendants brought them within the statute. Such question is to be decided upon their *intent*, and such intent was properly submitted to the jury, who found against the respondent, he being the only one on trial. There can, however, be no justification in law for the means employed by them to accomplish their purpose. Like other citizens, the corporations, and the servants of corporations, must enforce their rights peaceably under the law. The fact, if it were admitted, that the railroad company had a right of way over this race, is no excuse for the high-handed proceedings taken to build these piers, at the expense of the business of another corporation and to the terror of the people. And if the deliberate object and intent was to obstruct and impede the business of the Newaygo Manufacturing Company, and by force and intimidation, if necessary, to build the piers, such intent, in my opinion, would be willful and malicious, not-

withstanding the main intent was to gain a right for themselves, and the statute would be violated.

No one is authorized to unlawfully destroy or hinder the lawful business of another for the purpose of helping himself. I do not think the statute was aimed alone at malicious mischief done for spite or revenge, but at the conspiring together of people, or the acts and means of people, to obstruct the business of others, that they may gain thereby some advantage or profit to themselves.

I can see no "important and valuable primary purpose" in the acts of these men. The record, on the contrary, shows an unlawful and wanton purpose to injure another to accomplish private gain. The acts were not mere ordinary trespasses which the law will reach easily outside of this statute, but they were done for the purpose of obtaining control of the property of another by conduct and through motives so reckless, willful, and wanton as to include all the elements contained in the word "maliciously" used in the statute. Primary and secondary purposes or objects have no application to motives and intents under this statute. It seems to me that the statute was ordained, whether wisely or unwisely, to protect the business interests of our citizens from just such combinations of men to interfere, by force and intimidation, with such interests, and for the purpose of obstructing and impeding business to the advantage and profit of the men thus combining.

The section of the statute under which this information was undoubtedly framed, reads as follows:

"If two or more persons shall willfully and maliciously combine or conspire together to obstruct or impede, by any act, or by means of intimidation, the regular operation and conduct of the business of any railroad company, or any other corporation, firm, or individual in this State, or to impede, hinder, or obstruct, except by due process of law, the regular running of any locomotive engine, freight or passenger train, on any railroad, or the labor and business of any such corporation, firm, or individual, such persons shall, on

conviction thereof, be punished by imprisonment in the county jail for a period not more than three months, or in the State prison for a period not exceeding two years." How. Stat. § 9275.

The title of the act is as follows:

" An act to prohibit any person from obstructing the regular operation and conduct of the business of railroad companies or other corporations, firms, or individuals." Sess. Laws 1877, p. 5.

It is claimed that, to support a conviction under this act, the main intent and malice must be aimed at the business obstructed or impeded; and that in this case, it being shown that the main intent and purpose of the respondent and his associates was to build piers in the canal for the use and convenience of the railroad company, they cannot be convicted under this statute, even if it be shown that, in the accomplishment of their main intent, they obstructed and impeded the business of another, unlawfully, with the intent of doing so if it became necessary in order to carry out the main intent.

We have been referred to many English and some American cases in support of this position. But these cases all have reference to the common law or statutes directed against malicious mischief, and, in my opinion, do not apply to the statute under consideration. In cases of malicious mischief it has been generally held that the malice of the act must be against the owner of the property, and the offense is one against property.

Blackstone thus defines malicious mischief:

" Malicious mischief or damage. This is such as is done, not *animo furandi* or with an intent of gaining by another's loss, which is some, though a weak, excuse, but either out of a spirit of wanton cruelty, or black and diabolical revenge." 4 Bl. Comm. 243.

Bishop says:

" Malicious mischief at the common law is the willful de-

struction of some article of personal property from actual ill will or resentment towards its owner." 2 Bish. Crim. Law, § 983.

This statute evidently does not require malice to be shown against the owner of the business disturbed, or his property, in the same sense as does the common law in cases of malicious mischief. The statute was aimed at an offense which does not strictly belong to the domain of malicious mischief, as defined by the common law. The acts prohibited and punished might, under certain circumstances, as in this case, expose the perpetrators to the charge of riot, or come under the common law against conspiracies, but there is little, if any, of the elements of malicious mischief about them.

The statute was passed to prevent and punish a course of proceeding not defined at the common law, and of comparatively recent origin. The offense consists in the commission of certain acts, or in conspiring to commit the same; and the manner of committing these acts may furnish, if unexplained, a sufficient proof of the malice necessary under the statute. And this statute, in most of the cases against which it was manifestly intended to operate, would be rendered futile and of no effect, to apply to it the malice of the common law, as required in cases of malicious mischief. It was intended to punish all unlawful interference with the business of another when such interference is shown to be willful and malicious; and the malice need only be the general malice of the law of crime, and is to be proven in the same way as malice is established in other cases. The acts need not be inspired by any particular wantonness, cruelty, or revenge against the owner of the property, but the act itself may, as in other cases, furnish the presumption of malice.

Bishop, in his work on Statutory Crimes, in speaking of the law in the United States as applied to the statutory offenses against different classes of malicious mischief, says:

"Under a statute simply silent as to the mental condition

of the perpetrator, the malice of the common law of this offense [malicious mischief] will be required, in obedience to the rule that statutes in general terms are to be interpreted by the common law. But, where the specific 'maliciously' is employed, the evil intent is legislatively defined, and the question is whether is meant the restrictive malice of this offense, or the general malice of the law of crime. In a statute merely affirming the common law as to the act of mischief, the former might well be taken to be the meaning of 'maliciously;' but where, as in most cases of our enactments on this subject, the range is wider, evidently departing from the restricted common law as to the act, the same legislative purpose should be inferred as to the intent, giving the word *maliciously* its ordinary meaning." Bish. Stat. Cr. § 436.

From this authority, which appears to me to be sound in principle, it would seem that if the offense named in this statute could be classed under the head of malicious mischief, which I do not admit, it would still not be necessary, in order to convict, to establish a specific malice against the owner of the business impeded, or his property, but only the general malice of the common law, as the statute is not certainly a mere affirmance of the common law, but undertakes to create an offense and punish acts not known to the common law as malicious mischief.

If, as heretofore said, the intent be to obstruct and impede the business, the relations between the perpetrators of the acts and the owner of the business may be immaterial. If the intent be to do it unlawfully, it makes no difference whether it be from spite or revenge, or in the hope of gain and profit. The malice in either case will be presumed. Malice is best defined, in my opinion, as "a wicked intent to do an injury;" and it is not necessary that the malice be directed against any particular person; it may be deduced from an intent generally to injure.

It is a general rule, governing the law of malice, that when a man commits an act, unaccompanied by any circumstances justifying its commission, the law presumes that he has acted

advisedly, and with an intent to produce the consequences which have ensued.

The malice required by this statute need only be directed against the business injured, and there is no necessity under it of showing any particular ill will, spite, or revenge against the owner or owners of the business; and the malice against the business is presumed, in the absence of any explanation of the motive, from the acts and means used, and their natural consequences, as in any other offense. Nor does it matter if the primary purpose of the acts and means is not the obstruction or injury of the business of another; yet if, in the accomplishment of that primary purpose, the intent is to make such obstruction or harm an incident of such primary purpose, if necessary to accomplish it, then the malice follows, and is established by such intent, and the statute is violated.

It was held in *State v. Malloy,* 34 N. J. Law, 410, that—

"If a man cut down a marked tree in a boundary line for some alleged primary purpose, it is a question for the jury whether he did not also intend the collateral mischief which was the immediate and natural consequence of the means used."

The statute in New Jersey provided that—

"Any person who shall willfully or maliciously cut down or remove any trees upon which any such marks [referring to boundary marks] shall be made, with the intent to destroy such marks, shall, in every such case, upon conviction thereof, be adjudged guilty of a misdemeanor," etc.

The court said:

"If a man cut down a marked tree in a boundary line, with intent to destroy the marks, no express malice need be shown; it will be inferred. But if he cut down the tree with some other manifest intent not directly or indirectly involving a purpose to destroy the marks, then he could not be convicted under this statute. * * * If he cut down a particular tree, the law will presume that he intended to cut that tree down; and, if the immediate and natural consequence of

cutting it down is to destroy certain marks upon it, it may be presumed that he intended to destroy these marks, in the absence of all contradictory or explanatory reasons for his act showing some other purpose not involving such intent. * * * A man, it seems, intends that consequence which he contemplates, and which he expects to result from his act, and he therefore must be taken to intend every consequence which is the natural and immediate result of any act which he voluntarily does. In this respect the legal sense of the term 'intention' does not differ from its usual and ordinary meaning. It is therefore a *question for the jury* whether the agent did not, in attempting to attain his primary object, also intend the *collateral mischief* which was the necessary or even the natural consequence of the means used." See, also,. 2 Stark. Ev. *417.

The court also held that—

"This further intent might be gathered from the circumstances,—among them, the utter recklessness of consequences shown in destroying a tree having this peculiar value, known to the offender."

I know of no more fitting language to be applied to the case before us. The respondent and his companions knew that the business of the Newaygo Manufacturing Company must naturally and necessarily be obstructed and impeded by their operations, and they went upon the ground prepared to meet and silence all opposition to the accomplishment of their designs; and their intent was shown by their action, and the utter recklessness of the rights of others in the manner and method of their procedure. They offered no explanation of their conduct or motives upon the trial, and the jury were well warranted in finding a willful and malicious intent. If the acts had been shown to have been committed under a claim of right made in good faith, a different question would have been presented; but no such showing was made, or attempted to be made.

As this discussion has met all the errors relied upon in the brief and argument of defendant's counsel, it is not necessary to pursue the case further. I can find no error in the proceedings.

It will be therefore certified to the circuit court for the ·county of Newaygo that we find no error in the conviction ·of the respondent, and said court will proceed to judgment upon the verdict.

SHERWOOD and CHAMPLIN, JJ., concurred.

CAMPBELL, C. J. (*dissenting*). An information was filed ·in the Newaygo circuit charging defendant, as chief engineer, Fred. Coleman, assistant engineer, and James McLaughlin, road-master, of the Chicago & West Michigan Railway Company, and Adam McNabb, and other persons unknown, with .a conspiracy—

" Willfully and maliciously to obstruct and impede the ·regular operation and conduct of the business of the Newaygo Manufacturing Company, a corporation organized under the laws of this State, to wit, the manufacture of lumber, pails, and tubs, flour and feed, by it then and theretofore carried ·on in said village of Newaygo, by acts and means of intimi- ·dation, to wit, by then and there assembling together in the night-time, and entering upon the premises of said corporation in said village, and obstructing the usual flow of water in the canal thereon, owned by it, and by means of which its said business was and had been so carried on, and by force .and violence preventing the employés of said corporation from removing said obstructions, and thereby preventing the lowering of the water in said canal, and by causing a quantity ·of hay and other foreign material to float down said canal, and clog and obstruct the wheels used in propelling the machinery and mills and factory of said corporation in said ·village, which were then owned and operated by said corpora- ·tion for the purpose aforesaid," etc.

Respondents were ordered to be tried separately, and under ·the charge Petheram was convicted by general finding, there ¡being but one count in the information.

The prosecution was had under Act No. 11, Laws of 1877 ·(How. Stat. §§ 9274, 9275, 9276), entitled—

" An act to prohibit any person from obstructing the regu- ·lar operation and conduct of the business of railroad com- ·panies, or other corporations, firms, or individuals."

The act consists of three sections, the first of which punishes the willful and malicious obstruction, by any act, or by intimidation, except by due process of law, of the "regular operation and conduct of the business of any railroad company, or other corporation, firm, or individual in this State, or of the regular running of any locomotive engine, freight or passenger train, of any such company, or the labor and business of any such corporation, firm, or individual," by imprisonment not more than three months in the county jail, or not more than one year in the State prison.

The second section punishes any conspiracy to do any of those things by imprisonment not more than three months in the county jail, or not more than two years in the State prison. How the incomplete offense came to be made more serious than the completed one is not easy to determine.

The third section excepts from the operation of the statute workmen voluntarily leaving their employment.

Respondent, after the people had completed their showing, declined to put in testimony, and claimed, in addition to various special exceptions, that no case was legally made out against him. Objection is also made to the charge actually given.

Some objections were pointed out to the information below as more limited in its averments than the range of testimony admitted, and it is open to criticism for being less definite than is desirable. The objection that the conspiracy is not qualified by the necessary statutory words "willfully and maliciously" is made ineffectual by the fact that it is charged that they agreed to do the acts complained of "willfully and maliciously," and the idea is therefore sufficiently indicated. The objection to the absence of such facts will be referred to hereafter.

The information is not very clear as to what use was meant to be made of the specific acts spread out in the latter part. Strictly construed, these things are enumerated as the acts

which defendants conspired to do as the means of accomplishing the unlawful result complained of, as it would be proper, under our practice, to describe them. But on the trial the court treated this recital as a list of the overt acts done which defendant was notified would be relied on to show the conspiracy, and which, while not always necessary, are regarded by the best authorities as proper and desirable to be enumerated. It was especially important in the present case, because there was no proof of a conspiracy or of its bearing except as deducible from the acts complained of.

The first objection that was raised on this head was to the testimony of Mr. Daniels, who proceeded to describe the obstruction as consisting of a coffer-dam and timbers. Had the conspiracy been described generally as aimed at impeding the work by obstructing the flow of water in the canal, it might not have been important to allege how it was to be done, as any number of methods might be resorted to, none of which were directly foreseen or agreed upon. But, when the overt acts set out are relied on to prove the conspiracy, there is no reason why things actually done should not be properly described. Criminal pleading is sometimes more strictly construed than civil pleading, but it never can be less strictly. In a civil action it would be necessary to point out with some care the acts complained of, not only with a view of informing defendant, and avoiding variance, but also of enabling the sufficiency of the facts to be tested as making out the case when shown.

In this case there was a further reason. Had the information shown the erection of a coffer-dam by persons described, not as private persons, but as railway officers, it would have made it easier to present one of the main questions explanatory of the controversy, which was not adequately brought forward on the trial and charge; namely, the purpose and circumstances of the occupation of the canal.

The same difficulty arises in regard to the telephone being

interfered with, and the interference with the night watchman to keep him from giving an alarm. Neither of these was alleged in the information as having been either done or contemplated. It is evident from the record that both were relied on as important acts in the working out of the conspiracy. The court finally told the jury there was no testimony to connect the telephone matter with the conspiracy, but that was somewhat late, after the fact itself had been shown, and the court in the charge so referred to it. The testimony on both these subjects, when introduced, was received as very significant upon the purpose of the parties, and the testimony of the watchman was not stricken out.

The principal question in the case arises on its general features, and concerning the meaning and operation of the statute. The facts, therefore, so far as bearing on this, become important.

It appears that immediately after midnight of Saturday, January 23, 1886, respondent and his men began to put up a bulk-head and coffer-dam to shut out the water from the raceway or canal in question, and endeavored to do so without interruption, until they should have got a place free to work in so as to put in a pier for the railroad bridge that passed over the place in question. Had they not been interrupted, there is nothing to show that the mills could not have been running again on Monday morning. But early on Sunday morning the mill hands came down, and there was a continued conflict, interrupted, apparently, by some arrests, so that it took some further time to complete the work. When it was done, it appears from the testimony for the prosecution that the railroad people went off quietly, and there was no further action. It is manifest that the primary, if not the only, purpose of respondents, was to put in a pier for the railroad bridge, and that the acts complained of had no other incentive. That each party did what it could to carry out its purpose there is no serious dispute. But re-

spondent claims that the statute in question, as shown both by its title and its body, was not aimed at any but such conduct as was actuated by malice against the business alleged to have been interfered with, and had with a distinct purpose of interfering with its regular prosecution, and that acts done without such purpose and disposition do not fall within this particular statute, whether otherwise criminal or not, or civilly actionable for damages.

There are many cases in criminal law where a party is said to be responsible for the natural consequences of his acts, as impliedly intending them. But this doctrine is not usually applicable where a particular purpose is required for a conviction; and while every intent is deduced, if at all, chiefly from circumstances, yet a specific intent cannot be deduced unless it is plainly deducible beyond any reasonable doubt, and to the exclusion of any different one. - This is an elementary doctrine in criminal law.

If the defendant and his associates were acting illegally and riotously, without a right to enter upon the premises in question, they may have been responsible at common law, if not under some other statutes. But that would not bring them under this statute without something more.

It is very well known, and the statutes themselves show clearly, why such legislation was adopted. Its purpose was to protect business interests of various. kinds from being destroyed or interrupted by persons who, without any good reason, and from malicious motives against it or its owners, wished to hinder its prosecution. It is one of the various forms of malicious mischief which have been found necessary of prevention at various times by strong enactments, because they indicated such a disposition as was dangerous to the security of life and property. In England these laws are numerous, and many of them have been adopted in this country, or adapted to new occasions, and they have been construed in all cases with reference to the nature of the crimi-

nal purpose, and not on the principles of the common law concerning implied malice generally. There are not very many American decisions upon the subject, as until recently we have been less exposed to the sort of mischief which is aimed at the destruction of business. But there is no difference, so far as the authorities generally go, in the principles held applicable.

In this State only one case has been decided that is very analogous to this. That was the case of *People v. Dunkel*, 39 Mich. 255, where the respondent was charged with an offense under section 12 of article 4 of the general railroad law of 1873, the constitutionality of which was recently before us, and sustained, in the matter of the application of Seth Holcomb for a writ of *habeas corpus.* In *Dunkel's Case* he was charged with willfully endangering the lives of persons engaged in the work of railroads, and persons traveling on the train, by shooting a loaded pistol at them. The testimony showed clearly that he fired at a brakeman while in the discharge of his duty under circumstances which would have authorized a finding that the assault was felonious, and which would have made murder if he had died from its effects. It appeared that the brakeman, under orders from the conductor, put Dunkel off the train, and that, as he was getting back on the cars, Dunkel aimed at him, and shot a ball through his clothes. The jury convicted Dunkel under the statute, and therefore found the shooting willful. But this Court set aside the conviction on the ground that it was an assault with intent to kill or injure the brakeman individually, out of spite against him, and was not an act aimed against the safety of the train; and that the statute was intended only to reach cases where the purpose was to do mischief which imperiled the safety of passengers and employés by reason of their connection with the train itself, and was not meant to cover offenses against persons distinct from

that, and reached by other legal provisions. In other words, it was for the protection of railroads and their business, and the malice must be aimed in that direction.

And on a similar principle it was held in *Com. v. Killian*, 109 Mass. 345, that a statute punishing obstructing a train, and endangering the safety of those on it, did not cover a case where a passenger pulled the signal rope, and stopped a train, and put all the passengers in peril, although it came, as *Dunkel's Case* did, under the language of the statute, and created the danger contemplated.

In *Rex v. Williams*, 1 Leach, 529, it was held that under a statute punishing an assault made willfully and maliciously, with intent to spoil, cut, hurt, or deface the garments of another, a person inflicting a serious wound, whereby the garments of the person assaulted were badly cut and injured, was not within the statute, as the primary intent required must have been the injury to the clothes, and not the implied intent deducible from the act which could only reach the person through the garments. The statute there had been suggested by a systematic destruction of garments by persons employed in certain kinds of manufacturing, who assaulted passengers with that end.

In *State v. Malloy*, 34 N. J. Law, 410, where a statute punished severely the intentional destruction of marked boundary trees, it was held that the destruction of such a tree for a private use would not be punishable without the intent to destroy the boundary.

And so in *Reg. v. Pembliton*, L. R. 2 Cr. Cas. 119, where a person threw a heavy stone, intending to hit some one standing before a plate-glass window, and broke the glass, without having any malicious design against the glass, it was held he could not be convicted of an unlawful and malicious injury to the property. In the same case it is also held that the modern English statutes, which have changed the old law as to malicious intent, by declaring expressly that it need not be

against the owner, do not dispense with personal malice, but merely with the old rule requiring it shall be shown identically against the true owner. The books contain several cases under the older statutes where personal malice existed against persons actually or ostensibly in possession of property, and not owners, where the malice was held inapplicable. This was especially so in cases under the "Black Act," of wanton and cruel injuries to animals. 2 Russ. Crimes, c. 43.

Mr. Bishop, on Statutory Crimes, § 430, shows that the malice in all these cases means a malicious purpose aimed at the person who is owner, and a malevolent desire to injure him. The cases cited fully bear him out.

In *Rex v. Ross*, Russ. & R. Cr. Cas. 10, respondent was indicted under a statute punishing unlawfully and maliciously breaking down the head or mound of any fish-pond, whereby the fish shall be lost or destroyed. The prisoner broke down the mound or head to enable him to get at and steal fish, and it was held that this was not within the statute, which applied only to cases of wanton and malicious mischief in cutting the bank, and not where it was done for some other purpose, however unlawful.

This is also explained by Tomlins (Law Dict. "Mischief, Malicious"), where he says:

"This is such as is done, not *animo furandi,* or with an intent of gaining by another's loss, but either out of a spirit of wanton cruelty or wicked revenge."

The Supreme court of Massachusetts adopted this language in *Com. v. Walden*, 3 Cush. 558, in a case where a man was indicted for shooting at a mare. The court below had instructed the jury that the malice referred to in the statute meant only common-law malice, defined as—

"The willfully doing of any act prohibited by law, and for which the defendant had no lawful excuse, and that moral turpitude of mind was not necessary to be shown."

The higher court reversed the conviction, and, after dis-

cussing the inapplicability of the rule laid down in the charge as to malice, refer further to the stricter rule always applied in cases of malicious mischief, and quote from Tomlins as before stated, and cite Blackstone's definition (4 Bl. Comm. 243) to the same effect.

The same doctrine is repeated in *Com. v. Williams*, 110 Mass. 401, in a case of malicious injury to a building, and it was held it is not enough for the act to be willful and intentional; it must have been done out of cruelty, hostility, or revenge.

And similar rulings have been had under the English statutes concerning rioters willfully and maliciously demolishing or beginning to demolish houses, where it has been uniformly held the intent must be complete demolition, and that an attempt against a house for the purpose of seizing or injuring a person was not sufficient. *Rex v. Price*, 5 Car. & P. 510; *Rex v. Thomas*, 4 Id. 238. And in *Reg. v. Langford*, Car. & M. 602, where persons riotously attacked and tore down an occupied house, which the occupant claimed, but which was also claimed by one of the party, it was held that, if they acted on a belief that their associate owned it, their offense did not constitute a willful and malicious demolishing such as is covered by the statute.

A strong case to the same effect is *Reg. v. James*, 8 Car. & P. 131, where there was a dispute about a mine, and a party of men under orders of a person not owning it, but whom they supposed to own it, shut up an air-hole, which was made a felony if done willfully and maliciously; but they were held not punishable. And in a subsequent action for malicious prosecution against the real owner, who had procured the indictment, the court of queen's bench, while they held that the prosecution could not be held, as a matter of law, malicious without the finding of a jury, held, nevertheless, as a matter of law, that there was an absence of reasonable cause for the prosecution. *James v. Phelps*, 11 Adol. & E. 483.

Those cases are in point here for another purpose. The offense charged here is a conspiracy, in which there must be a joint, willful, and malicious common purpose, and men working under orders could not be held for such an offense on any presumption of an ulterior design.

Similar doctrine to that found in the cases before cited on malicious injuries is recognized in *Duncan v. State*, 49 Miss. 331; *Sattler v. People*, 59 Ill. 68; *Allison v. State*, 42 Ind. 354; *Rex v. Shepherd*, 1 Leach, 539; *Rex v. Pearce*, Id. 527; *Rex v. Austen*, Russ. & R. Cr. Cas. 490; *Rex v. Mogg*, 4 Car. & P. 364. And the general doctrine, as to specific intent, is further illustrated in *Reg. v. Sanderson*, 1 Fost. & F. 37, and note; *Rex v. Price*, 5 Car. & P. 510; 1 Bish. Crim. Law, §§ 427–429; *People v. Getchell*, 6 Mich. 496; *Shannon v. People*, 5 Id. 71; *Durant v. People*, 13 Id. 351; *Wilson v. People*, 24 Id. 410; *People v. Chappell*, 27 Id. 486.

There can be no doubt of the law that, where persons are charged with a conspiracy to bring about certain mischief, they cannot be convicted unless upon satisfactory proof that they actually conspired having in their minds the entire purpose forbidden by the statute. This case shows without dispute that what was done was in furtherance of a railroad bridge which was in course of construction, and that respondent was a servant of the railroad, and the other defendants acted under him. Unless they were acting in full, malicious, and willful purpose of wrong-doing, with the very intent punished by the statute, he could not be guilty of conspiracy unless they were, for one man cannot conspire. But, if they all acted together with one mind, it must still have been with the clear and malicious intent against the business as a business, and with the purpose of preventing its exercise for hostile and malevolent ends.

While the conspiracy was sought to be shown by the acts which ran through two or three days, it is laid and relied on as existing before the entry, and as animating it. There

was no business going on from Saturday midnight to Monday morning; and, if there was an expectation or purpose of getting in the pier during that interval, there could be no room, on any theory, for a statutory offense. But, beyond this, it as clearly appears that the parties went on for an important purpose connected with a corporate enterprise, which, if it had not actually the right to do what was done, could lawfully obtain it. If, as appears from the record, there was already a right of way for a bridge over this place, it is at least open to question whether it would not include such changes in the structure and its supports as should be found desirable or proper. The law does not sanction violations of right, but there is a great difference between a trespass to obtain possession or some other advantage, and a trespass which is merely for purposes of vexation and mischief. It cannot be supposed that our Legislature intended to make every trespass felonious that happens to interfere with the prosecution of business. There are private and public remedies which have always been held sufficient for such cases. It would be straining unduly the provisions of a law designed to prevent wanton interferences with business to make acts done with an important and valuable primary purpose come within those provisions.

The charge of the court ignored any possible excuse. It assumed that the conspiracy might be deduced purely from the acts which were shown, and that the hinderance of the business was itself unlawful and criminal; and the jury were instructed that the railroad, although defendants were named as its officers, had nothing to do with the matter. There was no instruction as to what would in law be regarded as willful and malicious, and it is only in referring to the form of the charge in the information that these necessary elements in the crime are mentioned at all. The jury, from the charge, would and probably did infer that, if respondent and his associates conspired to do just what they did accomplish,

they might convict under the statute, without reference to any further or different intent, and merely on proof of a trespass.   ·

There was no testimony whatever tending to show that any of the defendants had a desire to destroy or impair the business carried on by the Newaygo Manufacturing Company, or had any rival or opposing business interests; and there was nothing to raise any doubt of the main purpose of the undertaking.   If a conviction could be had under such a state of facts, there are very few, if any, trespasses to business property that might not, with equal justice, be held felonious within this statute.

I think the conviction should be set aside.