PEOPLE *v.* LAMB.[1]

1. CONSPIRACY—INFORMATION—SUFFICIENCY.

An information which charges a conspiracy " to commit extortion of and from " a named person is sufficient, notwithstanding the failure to use the words " the offense of " or " the crime of " immediately preceding the word " extortion," since the word " extortion " includes within it the idea of crime as much as though the conspiracy were alleged to be to commit any other well known crime.    HOOKER, MOORE, and CARPENTER, JJ., dissenting.

2. SAME—EXTORTION—EVIDENCE—SUFFICIENCY.

In a prosecution of an attorney and a justice of the peace for conspiracy to commit extortion, evidence examined, and *held,* sufficient to support a conviction for having demanded and received of the defendant in a bastardy case grossly excessive costs.    HOOKER, MOORE, and CARPENTER, JJ., dissenting.

Exceptions before judgment from Montcalm; Wolcott,

[1] Rehearing denied September 10, 1908.

J., presiding.   Submitted November 15, 1907.   (Docket No. 175.)   Decided July 13, 1908.

Frank Lamb and Floyd Winter were convicted of a conspiracy to commit the crime of extortion.   Affirmed.

*R. A. Hawley* and *Rarden & Rarden,* for appellants.

*Earl F. Phelps,* Prosecuting Attorney, for the people.

BLAIR, J.   In my opinion the information in this case is sufficient to support a conviction.   The information charges a conspiracy "to commit extortion of and from one Albert Eastman," etc.   I do not think that the failure of the pleader to use the words "the offense of" or "the crime of" immediately preceding the word "extortion" affects the substance of the charge.   The word "extortion" includes within it the idea of the crime as much so as though the conspiracy were alleged to be "to commit burglary."   I think this information is within the rule laid down by this court in the case of *People* v. *Butler,* 111 Mich. 483, and the cases there cited.   In that case the information charged that the respondents "did combine, conspire, confederate, and agree together by divers false pretenses, subtle means and devices to attain and acquire unto themselves of and from the county of Wayne a sum of money, to wit, the sum of $50, of the value of $50, of the money of it, the said county of Wayne, and to cheat and defraud it, the said county of Wayne, thereof, to the great damage of it, the said county of Wayne."   It was said by the court:

"It is the claim of the respondent that this information should have been quashed,—*First,* because it states no offense known to the law; *second,* because it contains no allegations of the means by which respondents conspired to cheat and defraud.   The claim of the respondent cannot be sustained.   The case is ruled by *People* v. *Richards,* 1 Mich. 216; *People* v. *Clark,* 10 Mich. 310; *People* v. *Winslow,* 39 Mich. 505; *People* v. *Petheram,* 64 Mich. 252; *People* v. *Watson,* 75 Mich. 582; *People* v. *Dyer,* 79 Mich. 480."

I am also of the opinion that there was sufficient evidence to take the question to the jury as to whether the conspiracy involved the extortion of illegal fees from Eastman.

Defendant Winter testified, in proceedings conducted by a bar committee appointed by the court for that purpose, among other things, as follows:

"I talked with Eastman afterwards, and among other things I said to him that, if it was my sister, he could not settle the matter for $10,000. We talked back and forth, and I don't remember who spoke of $200, but finally one of us did speak of $200, and Mr. Eastman said he would give the $200 and it was so arranged. I remember that in this talk some one said something about Eastman going over the road if the matter was not settled up. Either I or Mr. Lamb used these words, I think. * * * At the time, Mr. Eastman, Mr. Hendry, and myself were in my office closing up this matter, and, at the time these mortgages were given, something was said about the costs. Mr. Lamb had said there were some costs attached, and I talked with Lamb over the phone, and asked what the costs were, and he told me that they were $10. I do not know whether or not Mr. Eastman paid this $10. I did not see Eastman hand the $10 to Hendry."

Florence Parm testified:

"After we got down to the office, he [Winter] told my mother that, if she wanted the money, she would have to sign her name; said all he could get out of Albert Eastman was $25, and he had to scare that out of him."

John Hendry, the constable who served the warrant, testified:

"I took Eastman to Lamb's office when I arrested him. Mr. Lamb read the complaint to Eastman, and, before he hardly got through reading it, Eastman said: 'Yes; I am guilty. What does it cost to settle it.' Mr. Lamb told him that he could not settle it. He says, 'It is something I cannot settle here;' but he says: 'I understand Mr. Winter is her attorney. Perhaps it might be adjusted some way'— something like that. * * * I think Mr. Eastman asked Lamb where Winter's office was, and finally Lamb said to him, 'If the officer will

permit, I will go with you,' and I said to them, ' Go on if you want to,' and they went out. * * * About the time this transaction was closed Mr. Winter said to Eastman: ' You understand you are to pay the costs.' Eastman said, ' Yes,' and went right down in his pocket in a hurry, seemed to be anxious to get his money out to pay it, and asked how much the costs were, and Winter asked me how much the costs were, and I told him I did not know, and suggested that he would have to ask Lamb. I gave him the number of Lamb's phone and Winter called him and said to him: ' Those costs were $10, weren't they, in that case?' And he stepped down from the phone, and said: ' Yes; that is what they are.' Eastman gave me the $10, and after supper I went up to the justice office and gave the $10 to Mr. Lamb, and he gave me $5 of it for my fees, and I came away. I gave Lamb the same $5 (10) Eastman gave to me. I afterwards talked with Mr. Lamb in regard to this matter over at Stanton, and Mr. Lamb told me that he and Winter had divided thè money between them. That is all.· This was on the streets of Stanton. He said to me: ' They might as well own up; it was all off anyway '— and that Mr. Winter had told the whole circumstance just as it was, and he said, ' He and I divided the money between us, and that was all there was of it.' * * * After this matter was closed up and we were all together there in Winter's office, something was said about the costs. I did not know what the costs were, and Winter did not know. I suggested to Winter that he call up Lamb and find out, and Winter finally telephoned to Lamb. I don't know all the talk they had over the phone, but finally Winter said, ' Then the costs are $10;' but I don't know what Lamb said about it, of course. I don't remember all that was said over the phone by Winter at the time."

Eastman testified:

" I went back to Winter's office, and my wife went with me. I understood that this $175 that I was getting from Belknap and paying to Winter was to settle up with Mrs. Parm and the girl. I understood, also, at the time, that I was to pay the costs in addition to the $175, and that was the way I understood it right along. Before any money was paid over to Mrs. Parm, this question of costs was brought up; that is, as to how much the costs were. It was while I was there in the office, and the check was

brought down and laid on the table. Before we got through and got the thing fixed up, something was said about the amount of the costs; how much the costs were. I think that John Hendry first inquired about the costs. John Hendry said that I had got to pay the costs. He made the statement there that I had got to pay the costs. I think I asked him how much the costs were, and I think Hendry asked Winter, and Winter said that he did not know how much the costs were. Then somebody suggested that they call up Lamb and find out how much they were, and the reason that Lamb was called up was that none there knew how much the costs were. So Mr. Winter called up Mr. Lamb. When he got Mr. Lamb on the phone, he says: 'Lamb, how much are the costs?' Of course, I did not hear what Lamb replied, and finally Winter turned around and told me the costs were $10, and I paid the $10 to Hendry.   *   *   *

"*Q.* You have stated you paid these $10 costs?

"*A.* Yes, sir.

"*Q.* Who first spoke to you about the matter?

"*A.* About the costs?

"*Q.* Who told you to pay the costs or that you had got to pay them?

"*A.* I may be mixed up. I know one of them asked me. I think it was or might have been Hendry.

"*Q.* What is your best recollection as to whether it was Hendry or Mr. Winter?

"*A.* I said Mr. Winter once, didn't I?

"*Q.* What is your best recollection now in regard to it? Was it Mr. Hendry or Mr. Winter?

"*A.* I won't say, I can't prove it.

"*Q.* No; I didn't ask you to say for certain, but what is your best recollection in regard to it now, as to whether it was Mr. Winter or Mr. Hendry told you that you had got to pay the costs?

"*A.* I think it was Hendry said so."

It appears from the testimony that Eastman understood all the time that he was to pay the costs in addition to the $175, and about the time the transaction was closed respondent Winter called Eastman's attention to this, according to the testimony of Hendry, saying, "You understand you are to pay the costs," to which Eastman said, "Yes." It further appears from Winter's own testimony

that prior to the meeting at his office to close the matters up "Mr. Lamb had said there was some costs attached," etc.

From this testimony the jury might fairly infer that part of the original scheme was that Eastman was to pay not only the $175, but also the costs of the proceedings before the justice, and that it was part of the original understanding between the respondents that they should get for themselves as much as possible over and above the amount which Mrs. Parm would accept and as much as they could get in excess of the legal costs. This view is, I think, borne out by the fact that, according to the testimony of Hendry, Winter did not ask Lamb what the costs were, but said to him, "Those costs were $10, weren't they, in that case?" indicating an agreement theretofore between Winter and Lamb as to the amount of costs which they would demand, and which both of them knew was grossly excessive. So far as these questions are concerned, which are the only questions discussed in the opinion now before the court, I think the rulings of the circuit judge should be sustained.

I have examined the record with reference to the other assignments of error relative to the rulings of the court upon the admission of testimony, the refusal of requests to charge, and to portions of the charge as given, and am of the opinion that they are not well founded. The jury were distinctly instructed that a conviction could not be had for obtaining the $175, but only for obtaining the $10 of costs. The charge correctly stated the claims of the parties and the rules of law applicable to the case, and the rights of the respondents were carefully protected.

The conviction is affirmed, and the record remanded for further proceedings in accordance with the law.

GRANT, C. J., and MONTGOMERY, OSTRANDER, and McALVAY, JJ., concurred with BLAIR, J.

HOOKER, J. (*dissenting*). The defendants were con-

victed of the offense of conspiracy upon an information, the substance of which follows:

"That Frank Lamb and Floyd Winter unlawfully, falsely, deceitfully, and fraudulently did combine, conspire, confederate, and agree together to commit extortion of and from one Albert Eastman, and the said Frank Lamb and the said Floyd Winter did on the said 5th day of March, A. D. 1907, in the said city of Greenville, in said county, in pursuance of and according to the said conspiracy, combination, confederacy, and agreement between them, unlawfully, corruptly, deceitfully, and extorsively extort, receive, and take of and from the said Albert Eastman the sum of one hundred and eighty-five dollars, of the value of one hundred and eighty-five dollars, to the great damage of the said Albert Eastman, and to the evil example of all others."

We are asked to review the trial upon writ of error sued out in behalf of both defendants.

Several questions are raised, the most far-reaching of which are two, viz.: Did the information state, and did the testimony tend to prove, an offense? There was no serious dispute about the facts. They were, in substance, that Lamb, who was a justice of the peace, was approached by a Mrs. Parm and her daughter, a girl of under 16, who complained that she was enceinte, and charged one Eastman with the paternity of her prospective offspring. They wished to have Eastman arrested and made to pay them something for the disgrace and the support of the child, should one be born. She signed a complaint, and a warrant for bastardy was issued, and Eastman was arrested. Winter, the other defendant, was a lawyer. After the Parms left his office, Lamb telephoned to Winter, asking him to come to his (Lamb's) office. Winter said, "What is the trouble?" and Lamb replied, "Nothing, only there is something on, something good." Winter complied, and Lamb told him what had occurred, and suggested that he act as attorney for Mrs. Parm and her daughter against Eastman, stating that they would be satisfied with $25 or $35, and suggesting that the balance

that they could get from Eastman could be divided equally between them. This was agreed to, and Lamb gave Winter a note to Mrs. Parm. The note and the interview that followed, as stated by Winter, were as follows:

"Eastman was arrested and brought before Lamb just after noon on the same day, and, when the warrant was read to him, he said he was guilty and wanted to settle; he saying at the time: 'Yes; I am guilty. What does it cost to settle it?' No one had previously said anything to him about settling the matter. Lamb told him that he [Lamb] could not settle it, but suggested that Winter was Mrs. Parm's attorney, and that he better go to him. Eastman not knowing where Winter's office was, Lamb went with him to Winter's office, leaving the officer at Lamb's office."

Eastman paid Winter $175, of which $25 was paid to Mrs. Parm. She gave the following receipt to Winter:

"GREENVILLE, MICHIGAN, March 5, '07.
"I hereby agree to accept $25 in full of all claims which I may have against Albert Eastman for bastardy with my daughter.
[Signed]    "CLARA PARM."

It appeared from the testimony of Winter and others that, at the time of the adjustment of the matter in Winter's office, there was talk about costs. Hendry, the officer who made the arrest, testified:

"About the time this transaction was closed Mr. Winter said to Eastman: 'You understand you are to pay the costs.' Eastman said, 'Yes,' and went right down in his pocket in a hurry; seemed to be anxious to get his money out to pay it, and asked how much the costs were, and Winter asked me how much the costs were, and I told him I did not know, and suggested that he would have to ask Lamb. I gave him the number of Lamb's phone, and Winter called him and said to him: 'Those costs were $10, weren't they, in that case?' And he stepped down from the phone and said: 'Yes; that is what they are.' Eastman gave me the $10, and after supper I went up to the justice's office and gave the $10 to Lamb, and he gave me $5 of it for my fees, and I came away. I gave Lamb the $5 (10) Eastman gave to me. * * * I did not

know what the costs were, and Winter did not know. I suggested to Winter that he call up Lamb and find out, and Winter finally telephoned to Lamb. I don't know all the talk they had over the phone, but finally Winter said: 'Then the costs are $10.' But I don't know what Lamb said about it, of course. I don't remember all that was said over the phone by Winter at the time."

Eastman testified:

"That he was not sure whether Winter or Hendry first spoke about the costs, but thought it was Hendry. I understood all the time that I was to pay the costs in addition to the $175, and that was the way I understood it right along. Before any money was paid over to Mrs. Parm, this question of costs was brought up; that is, as to how much the costs were. It was while I was there in the office, and the check was brought down and laid on the table. Before we got through and got the thing fixed up, something was said about the amount of the costs; how much the costs were. I think that John Hendry first inquired about the costs. John Hendry said that I had got to pay the costs. He made the statement there that I had got to pay the costs. I think I asked him how much the costs were, and I think Hendry asked Winter, and Winter said that he did not know how much the costs were. Then somebody suggested that they call up Lamb, and find out how much they were, and the reason that Lamb was called up was that none there knew how much the costs were. So Mr. Winter called up Mr. Lamb. When he got Mr. Lamb on the phone, he says: 'Lamb, how much are the costs?' Of course, I did not hear what Lamb replied, and finally Winter turned around and told me the costs were $10, and I paid the $10 to Hendry."

There was no testimony indicating that the subject of costs or fees was ever discussed by the parties except in the talk by telephone, except that of Winter as to talk at the time of the settlement, when it was said there were some costs, and the statement by Winter that Lamb had said that there were some costs attached which does not indicate a conspiracy relating to costs.

Counsel for defendants claim: This record shows that the defendants entered into an arrangement, whereby

Lamb should aid Winter in getting the consent of Mrs. Parm and her daughter to allow Winter to represent them in a settlement of the matter with Eastman, that the case should be settled for as large a sum as practicable, and that Mrs. Parm should be induced to accept a small sum, and that the defendants would divide the excess between themselves. There is not a syllable of evidence that they had any talk or thought of extorting illegal official fees from anyone. The claim of the prosecution being that the offense was a conspiracy to extort official fees, it appears to have been sustained only upon the theory that the money received and divided must be treated (so far at least as concerns the portion received by Justice Lamb) as excessive compensation in the way of payment for official duties, and the learned circuit judge allowed the jury to so find. The evidence shows that the only charge made for official action was $10 called costs, and this was paid by Eastman as such. If there is any evidence that the sum was excessive, it is affirmatively and conclusively proved that it was never the subject of a conspiracy. It was not even divided with Winter.

The subject of the conspiracy was the amount that should be obtained from Eastman for the complainant for a wrong committed by him, which the complainant might lawfully settle, and a part of which it was contemplated that Winter should obtain for his services, and which he should divide with the justice for sending the case to him, and possibly such assistance as Lamb might give him, which was not the subject of official fees and which nothing indicates that the parties understood to be so. We are of the opinion that the court erred in this instruction.

The information. It remains to inquire whether there is occasion for a new trial. Had this information charged that the defendants conspired "to commit *the offense* of extortion," or to commit specified acts which would, if committed, constitute extortion under any of our statutes (see 3 Comp. Laws, §§ 11240, 11241, 11242, 11326), it is possible that it might be sustained under the rule stated in

*Alderman* v. *People*, 4 Mich. 432, and *People* v. *Butler*,
111 Mich. 483, and cases there cited. It does neither,
though it does allege that the defendants conspired to
"commit extortion." The *Case of Alderman* was recognized as an extreme case, though it rests upon a necessity,
viz., that others cannot know, and perhaps even conspirators may not know, upon whom or by what means the
contemplated offense is expected to be or may be practiced,
and therefore it is sufficient where the offense has a well-settled meaning at common law, so that by describing it
by the term by which it is generally known the nature of
the offense contemplated by the conspirators is clearly indicated to describe it by such term. If the omission of
the words "offense of" is permissible without destroying
the validity of the information—which I might assent to,
did the case turn upon that question alone—I am nevertheless impressed that, inasmuch as the information shows
that the conspiracy was carried out "*in pursuance of*
and *according to the* conspiracy, combination, confederacy, and agreement between them, the defendants," to do
a thing which in and of itself as therein described, would
not necessarily be extortion when done, the first general
allegation is so qualified as to make the charge uncertain.
I have had doubts whether this language should not be held
to so qualify the first statement as to render it doubtful
whether the conspiracy was to extort unlawful official
fees, or to unlawfully, fraudulently, and deceitfully extort money (not official fees) from Eastman, by duress or
fraud or by some other means, not necessarily criminal.
It is as though it charged specifically in the first instance
a conspiracy to do the very acts which the instrument
mentions as being done in "pursuance of, and accordance
with the conspiracy, combination, confederacy, and agreement," and which do not justify an inference of taking
pretended official fees by an officer or anyone else, and
which, standing alone, would be insufficient. Under the
rule of strict construction applicable to informations, this
language is the more particular description of what the

parties conspired to do, and must be taken in preference to the general description, extortion, at least to the extent of rendering uncertain the former allegation. It limits the general language, to say the least, and introduces an element of uncertainty not usually tolerated in informations. Whereas in this case there is not a clear, positive, and unqualified charge that the conspiracy was to commit an offense having a well-known and not uncertain meaning, the case is not necessarily covered by the rule invoked.

I am therefore of the opinion that the judgment should be reversed and defendants discharged.

MOORE and CARPENTER, JJ., concurred with HOOKER, J.