PAUL J. PLANT & others *vs.* HENRY K. WOODS & others.

Hampden.     September 26, 1899. — September 5, 1900.

Present: HOLMES, C. J., KNOWLTON, LATHROP, HAMMOND, & LORING, JJ.

*Conspiracy by Members of Labor Union to compel others to join Union — Coercion and Intimidation by Threats to Employers of Strikes and Boycotts — Equity — Injunction.*

If the members of one labor union conspire to compel the members of another union of the same craft to join the former union, from which they have withdrawn, and to carry out their purpose threaten strikes and boycotts to induce the employers of the members of the latter union either to get them to ask for reinstatement in the former union, or, failing so to do, then to discharge them, although no acts of personal violence or of physical injury to property are committed, such conspiracy and the acts in pursuance of it are unlawful, and having caused, and being likely still further to cause, injury, equity will restrain the actors by injunction. HOLMES, C. J., dissenting.

BILL IN EQUITY, filed in the Superior Court, by the officers and members " of the voluntary association known as Union 257, Painters and Decorators of America of Springfield, Massachusetts, which Union is affiliated with a national organization of the same name, with headquarters at Lafayette in the State of Indiana," against the officers and members " of the voluntary association known as Union 257, Painters and Decorators of America, which Union is affiliated with a national organization

of the same name, with headquarters at Baltimore in the State of Maryland," to restrain the defendants from any acts or the use of any methods tending to prevent the members of the plaintiff association from securing employment or continuing in their employment. Hearing before *Dewey*, J., who entered the following decree :

"This cause came on to be heard, and was argued by counsel; and thereupon, on consideration thereof, it is ordered, adjudged, and decreed that the defendant association, the defendants, and each and every of them, their committees, agents, and servants, be restrained and strictly enjoined from interfering and from combining, conspiring, or attempting to interfere, with the employment of members of the plaintiffs' said association, by representing or causing to be represented in express or implied terms, to any employer of said members of plaintiffs' association, or to any person or persons or corporation who might become employers of any of the plaintiffs, that such employers will suffer or are likely to suffer some loss or trouble in their business for employing or continuing to employ said members of plaintiffs' said association; or by representing, directly or indirectly, for the purpose of interfering with the employment of members of the plaintiffs' said association, to any who have contracts or may have contracts for services to be performed by employers of members of plaintiffs' said association, that such persons will or are likely to suffer some loss or trouble in their business for allowing such employers of members of plaintiffs' said association (and because they are such employers) to obtain or perform such contracts; or by intimidating, or attempting to intimidate, by threats, direct or indirect, express or implied, of loss or trouble in business, or otherwise, any person or persons or corporation who now are employing or may hereafter employ or desire to employ any of the members of the plaintiffs' said association; or by attempting by any scheme or conspiracy, among themselves or with others, to annoy, hinder, or interfere with, or prevent any person or persons or corporation from employing or continuing to employ a member or members of plaintiffs' said association; or by causing, or attempting to cause, any person to discriminate against any employer of members of plaintiffs' said association (because he is such employer) in giving or allow-

ing the performance of contracts to or by such employer; and from any and all acts, or the use of any methods, which by putting or attempting to put any person or persons or corporation in fear of loss or trouble, will tend to hinder, impede, or obstruct members, or any member, of the plaintiffs' said association from securing employment or continuing in employment. And that the plaintiffs recover their costs, taxed as in an action of law."

The case was reported, at the request of both parties, for the determination of this court. The facts appear in the opinion.

*W. R. Heady*, (*J. W. Flannery* with him,) for the plaintiffs.

*W. H. McClintock*, (*J. B. Carroll* with him,) for the defendants.

HAMMOND, J. This case arises out of a contest for supremacy between two labor unions of the same craft, having substantially the same constitution and by-laws. The chief difference between them is that the plaintiff union is affiliated with a national organization having its headquarters in Lafayette in the State of Indiana, while the defendant union is affiliated with a similar organization having its headquarters in Baltimore in the State of Maryland. The plaintiff union was composed of workmen who in 1897 withdrew from the defendant union.

There does not appear to be anything illegal in the object of either union as expressed in its constitution and by-laws. The defendant union is also represented by delegates in the Central Labor Union, which is an organization composed of five delegates from each trade union in the city of Springfield, and had in its constitution a provision for levying a boycott upon a complaint made by any union.

The case is before us upon a report after a final decree in favor of the plaintiffs, based upon the findings stated in the report of the master.

The contest became active early in the fall of 1898. In September of that year, the members of the defendant union declared "all painters not affiliated with the Baltimore headquarters to be non-union men," and voted to "notify the bosses" of that declaration. The manifest object of the defendants was to have all the members of the craft subjected to the rules and discipline of their particular union, in order that they might have better control over the whole business, and to that end they combined and conspired to get the plaintiffs and each of them to join

the defendant association, peaceably if possible, but by threat and intimidation if necessary. Accordingly, on October 7, they voted that " if our demands are not complied with, all men working in shops where Lafayette people are employed refuse to go to work." The plaintiffs resisting whatever persuasive measures, if any, were used by the defendants, the latter proceeded to carry out their plan in the manner fully set forth in the master's report. Without rehearsing the circumstances in detail it is sufficient to say here that the general method of operations was substantially as follows.

A duly authorized agent of the defendants would visit a shop where one or more of the plaintiffs were at work and inform the employer of the action of the defendant union with reference to the plaintiffs, and ask him to induce such of the plaintiffs as were in his employ to sign applications for reinstatement in the defendant union. As to the general nature of these interviews the master finds that the defendants have been courteous in manner, have made no threats of personal violence, have referred to the plaintiffs as non-union men, but have not otherwise represented them as men lacking good standing in their craft; that they have not asked that the Lafayette men be discharged, and in some cases have expressly stated that they did not wish to have them discharged, but only that they sign the blanks for reinstatement in the defendant union. The master, however, further finds, from all the circumstances under which those requests were made, that the defendants intended that employers of Lafayette men should fear trouble in their business if they continued to employ such men, and that employers to whom these requests were made were justified in believing that a failure on the part of their employees who were Lafayette men to sign such reinstatement blanks, and a failure on the part of the employers to discharge them for not doing so, would lead to trouble in the business of the employers in the nature of strikes or a boycott, and the employers to whom these requests were made did believe that such results would follow, and did suggest their belief to the defendants, and the defendants did not deny that such results might occur; that the strikes which did occur appear to have been steps taken by the defendants to obtain the discharge of such employees as were Lafayette men who declined to sign applica-

tion blanks for reinstatement; that these defendants did not in all cases threaten a boycott of the employers' business, but did threaten that the place of business of at least one such employer would be left off from a so-called " fair list " to be published by the Baltimore Union.  The master also found that, from all the evidence presented, the object which the Baltimore men and the defendant association sought to accomplish in all the acts which were testified to was to compel the members of the Lafayette Union to join the Baltimore Union, and as a means to this end they caused strikes to be instituted in the shops where strikes would seriously interfere with the business of the shops, and in all other shops they made such representations as would lead the proprietors thereof to expect trouble in their business.

We have, therefore, a case where the defendants have conspired to compel the members of the plaintiff union to join the defendant union, and to carry out their purpose have resolved upon such coercion and intimidation as naturally may be caused by threats of loss of property by strikes and boycotts, to induce the employers either to get the plaintiffs to ask for reinstatement in the defendant union, or, that failing, then to discharge them.  It matters not that this request to discharge has not been expressly made.  There can be no doubt, upon the findings of the master and the facts stated in his report, that the compulsory discharge of the plaintiffs in case of non-compliance with the demands of the defendant union is one of the prominent features of the plan agreed upon.

It is well to see what is the meaning of this threat to strike, when taken in connection with the intimation that the employer may " expect trouble in his business."  It means more than that the strikers will cease to work.  That is only the preliminary skirmish.  It means that those who have ceased to work will, by strong, persistent, and organized persuasion and social pressure of every description, do all they can to prevent the employer from procuring workmen to take their places.  It means much more. It means that, if these peaceful measures fail, the employer may reasonably expect that unlawful physical injury may be done to his property; that attempts in all the ways practised by organized labor will be made to injure him in his business, even to his ruin, if possible; and that, by the use of vile and opprobrious

epithets and other annoying conduct, and actual and threatened personal violence, attempts will be made to intimidate those who enter or desire to enter his employ; and that whether or not all this be done by the strikers or only by their sympathizers, or with the open sanction and approval of the former, he will have no help from them in his efforts to protect himself.

However mild the language or suave the manner in which the threat to strike is made under such circumstances as are disclosed in this case, the employer knows that he is in danger of passing through such an ordeal as that above described, and those who make the threat know that as well as he does. Even if the intent of the strikers, so far as respects their own conduct and influence, be to discountenance all actual or threatened injury to person or property or business, except that which is the direct necessary result of the interruption of the work, and even if their connection with the injurious and violent conduct of the turbulent among them or of their sympathizers be not such as to make them liable criminally or even answerable civilly in damages to those who suffer, still with full knowledge of what is to be expected they give the signal, and in so doing must° be held to avail themselves of the degree of fear and dread which the knowledge of such consequences will cause in the mind of those — whether their employer or fellow workmen —° against whom the strike is directed; and the measure of coercion and intimidation imposed upon those against whom the strike is threatened or directed is not fully realized until all those probable consequences are considered.

Such is the nature of the threat, and such the degree of coercion and intimidation involved in it.

If the defendants can lawfully perform the acts complained of in the city of Springfield, they can pursue the plaintiffs all over the State in the same manner, and compel them to abandon their trade or bow to the behests of their pursuers.

It is to be observed that this is not a case between the employer and employed, or, to use a hackneyed expression, between capital and labor, but between laborers all of the same craft, and each having the same right as any one of the others to pursue his calling. In this, as in every other case of equal rights, the right of each individual is to be exercised with due regard to the sim-

ilar right of all others, and the right of one be said to end where that'of another begins.

The right involved is the right to dispose of one's labor with full freedom. This is a legal right, and it is entitled to legal protection. Sir William Erle in his book on Trade Unions, page 12, has stated this in the following language, which has been several times quoted with approval by judges in England: "Every person has a right under the law, as between him and his fellow subjects, to full freedom in disposing of his own labor or his own capital according to his own will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction to the fullest exercise of this right which can be made compatible with the exercise of similar rights by others. Every act causing an obstruction to another in the exercise of the right comprised within this description — done, not in the exercise of the actor's own right, but for the purpose of obstruction — would, if damage should be caused thereby to the party obstructed, be a violation of this prohibition."

The same rule is stated with care and discrimination by Wells, J. in *Walker* v. *Cronin*, 107 Mass. 555, 564: "Every one has a right to enjoy the fruits and advantages of his own enterprise, industry, skill and credit. He has no right to be protected against competition; but he has a right to be free from malicious and wanton interference, disturbance or annoyance. If disturbance, or loss, come as a result of competition, or the exercise of like rights by others, it is *damnum absque injuria*, unless some superior right by contract or otherwise is interfered with. But if it come from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing."

In this case the acts complained of were calculated to cause damage to the plaintiffs, and did actually cause such damage; and they were intentionally done for that purpose. Unless, therefore, there was justifiable cause, the acts were malicious and unlawful. *Walker* v. *Cronin, ubi supra.* *Carew* v. *Rutherford,* 106 Mass. 1, and cases cited therein.

The defendants contend that they have done nothing unlawful, and, in support of that contention, they say that a person

may work for whom he pleases; and, in the absence of any contract to the contrary, may cease to work when he pleases, and for any reason whatever, whether the same be good or bad; that he may give notice of his intention in advance, with or without stating the reason ; that what one man may do several men acting in concert may do, and may agree beforehand that they will do, and may give notice of the agreement; and that all this may be lawfully done notwithstanding such concerted action may, by reason of the consequent interruption of the work, result in great loss to the employer and his other employees, and that such a result was intended.    In a general sense, and without reference to exceptions arising out of conflicting public and private interests, all this may be true.

It is said also that, where one has the lawful right to do a thing, the motive by which he is actuated is immaterial.    One form of this statement appears in the first head-note in *Allen* v. *Flood*, as reported in [1898] A. C. 1, as follows: "An act lawful in itself is not converted by a malicious or bad motive into an unlawful act so as to make the doer of the act liable to a civil action."    If the meaning of this and similar expressions is that where a person has the lawful right to do a thing irrespective of his motive, his motive is immaterial, the proposition is a mere truism.    If, however, the meaning is that where a person, if actuated by one kind of a motive, has a lawful right to do a thing, the act is lawful when done under any conceivable motive, or that an act lawful under one set of circumstances is therefore lawful under every conceivable set of circumstances, the proposition does not commend itself to us as either logically or legally accurate.

In so far as a right is lawful, it is lawful, and in many cases the right is so far absolute as to be lawful whatever may be the motive of the actor, as where one digs upon his own land for water, (*Greenleaf* v. *Francis*, 18 Pick. 117,) or makes a written lease of his land for the purpose of terminating a tenancy at will, (*Groustra* v. *Bourges*, 141 Mass. 7,) but in many cases the lawfulness of an act which causes damage to another may depend upon whether the act is for justifiable cause; and this justification may be found sometimes in the circumstances under which it is done irrespective of motive, sometimes in the motive

alone, and sometimes in the circumstances and motive combined.

This principle is of very general application in criminal law, and also is illustrated in many branches of the civil law, as in cases of libel and of procuring a wife to leave her husband. *Tasker* v. *Stanley*, 153 Mass. 148, and cases therein cited. Indeed the principle is a prominent feature underlying the whole doctrine of privilege, malice, and intent. See on this an instructive article in 8 Harvard Law Review, 1, where the subject is considered at some length.

It is manifest that not much progress is made by such general statements as those quoted above from *Allen* v. *Flood*, whatever may be their meaning.

Still standing for solution is the question, Under what circumstances, including the motive of the actor, is the act complained of lawful, and to what extent?

In cases somewhat akin to the one at bar this court has had occasion to consider the question how far acts, manifestly coercive and intimidating in their nature, which cause damage and injury to the business or property of another, and are done with intent to cause such injury and partly in reliance upon such coercion, are justifiable.

In *Bowen* v. *Matheson*, 14 Allen, 499, it was held to be lawful for persons engaged in the business of shipping seamen to combine together into a society for the purpose of competing with other persons engaged in the same business, and it was held lawful for them, in pursuance of that purpose, to take men out of a ship, if men shipped by a non-member were in that ship; to refuse to furnish seamen through a non-member; to notify the public that they had combined against non-members, and had "laid the plaintiff on the shelf"; to notify the plaintiff's customers and friends that the plaintiff could not ship seamen for them; and to interfere in all these ways with the business of the plaintiff as a shipping agent, and compel him to abandon the same. The justification for these acts, so injurious to the business of the plaintiff and so intimidating in their nature, is to be found in the law of competition. No legal right of the plaintiff was infringed upon, and, as stated by Chapman, J., in giving the opinion of the court (p. 503), " if their effect is

to destroy the business of shipping-masters who are not members of the association, it is such a result as in the competition of business often follows from a course of proceeding that the law permits." The primary object of the defendants was to build up their own business, and this they might lawfully do to the extent disclosed in that case, even to the injury of their rivals.

Similar decisions have been made in other courts where acts somewhat coercive in their nature and effect have been held justifiable under the law of competition. *Mogul Steamship Co.* v. *McGregor*, [1892] A. C. 25. *Bohn Manuf. Co.* v. *Hollis*, 54 Minn. 223. *Macauley* v. *Tierney*, 19 R. I. 255.

On the other hand, it was held in *Carew* v. *Rutherford*, 106 Mass. 1, that a conspiracy against a mechanic, — who is under the necessity of employing workmen in order to carry on his business, — to obtain a sum of money from him which he is under no legal obligation to pay, by inducing his workmen to leave him, or by deterring others from entering into his employ, or by threatening to do this so that he is induced to pay the money demanded, under a reasonable apprehension that he cannot carry on his business without yielding to the demands, is an illegal, if not a criminal, conspiracy ; that the acts done under it are illegal, and that the money thus obtained may be recovered back. Chapman, C. J., speaking for the court, says that there is no doubt that, if the parties under such circumstances succeed in injuring the business of the mechanic, they are liable to pay all the damages done to him.

That case bears a close analogy to the one at bar. The acts there threatened were like those in this case, and the purpose was, in substance, to force the plaintiff to give his work to the defendants, and to extort from him a fine because he had given some of his work to other persons.

Without now indicating to what extent workmen may combine and in pursuance of an agreement may act by means of strikes and boycotts to get the hours of labor reduced or their wages increased, or to procure from their employers any other concession directly and immediately affecting their own interests, or to help themselves in competition with their fellow-workmen, we think this case must be governed by the principles laid down

in *Carew* v. *Rutherford, ubi supra.* The purpose of these defendants was to force the plaintiffs to join the defendant association, and to that end they injured the plaintiffs in their business, and molested and disturbed them in their efforts to work at their trade. It is true they committed no acts of personal violence, or of physical injury to property, although they threatened to do something which might reasonably be expected to lead to such results. In their threat, however, there was plainly that which was coercive in its effect upon the will. It is not necessary that the liberty of the body should be restrained. Restraint of the mind, provided it would be such as would be likely to force a man against his will to grant the thing demanded, and actually has that effect, is sufficient in cases like this. As stated by Lord Bramwell in *Regina* v. *Druitt,* 10 Cox C. C. 592, 600, "No right of property, or capital, . . . was so sacred, or so carefully guarded by the law of this land, as that of personal liberty. . . . That liberty was not liberty of the body only. It was also a liberty of the mind and will; and the liberty of a man's mind and will, to say how he should bestow himself and his means, his talents, and his industry, was as much a subject of the law's protection as was that of his body."

It was not the intention of the defendants to give fairly to the employer the option to employ them or the plaintiffs, but to compel the latter against their will to join the association, and to that end to molest and interfere with them in their efforts to procure work by acts and threats well calculated by their coercive and intimidating nature to overcome the will.

The defendants might make such lawful rules as they please for the regulation of their own conduct, but they had no right to force other persons to join them.

The necessity that the plaintiffs should join this association is not so great, nor is its relation to the rights of the defendants, as compared with the right of the plaintiffs to be free from molestation, such as to bring the acts of the defendants under the shelter of the principles of trade competition. Such acts are without justification, and therefore are malicious and unlawful, and the conspiracy thus to force the plaintiffs was unlawful. Such conduct is intolerable, and inconsistent with the spirit of our laws.

The language used by this court in *Carew* v. *Rutherford*, 106 Mass. 1, 15, may be repeated here with emphasis, as applicable to this case : " The acts alleged and proved in this case are peculiarly offensive to the free principles which prevail in this country ; and if such practices could enjoy impunity, they would tend to establish a tyranny of irresponsible persons over labor and mechanical business which would be extremely injurious to both." See, in addition to the authorities above cited, *Commonwealth* v. *Hunt*, 4 Met. 111 ; *Sherry* v. *Perkins*, 147 Mass. 212, 214 ; *Vegelahn* v. *Guntner*, 167 Mass. 92, 97 ; St. 1894, c. 508, § 2 ; * *State* v. *Donaldson*, 3 Vroom, 151 ; *State* v. *Stewart*, 59 Vt. 273 ; *State* v. *Glidden*, 55 Conn. 46 ; *State* v. *Dyer*, 67 Vt. 690 ; *Lucke* v. *Clothing Cutters & Trimmers' Assembly*, 77 Md. 396.

As the plaintiffs have been injured by these acts, and there is reason to believe that the defendants contemplate further proceedings of the same kind which will be likely still more to injure the plaintiffs, a bill in equity lies to enjoin the defendants. *Vegelahn* v. *Guntner*, *ubi supra*.

Some phases of the labor question have recently been discussed in the very elaborately considered case of *Allen* v. *Flood*, *ubi supra*. Whether or not the decision made therein is inconsistent with the propositions upon which we base our decision in this case, we are not disposed, in view of the circumstances under which that decision was made, to follow it. We prefer the view expressed by the dissenting judges, which view, it may be remarked, was entertained not only by three of the nine lords who sat in the case, but also by the great majority of the common law judges who had occasion officially to express an opinion.

There must be, therefore, a decree for the plaintiffs. We think, however, that the clause, " or by causing or attempting to cause, any person to discriminate against any employer of members of plaintiffs' said association (because he is such employer) in giving or allowing the performance of contracts to or by such employer," is too broad and indefinite, inasmuch as it might seem to include mere lawful persuasion and other similar and peaceful acts ; and for that reason, and also because so far as respects un-

---

* This section is as follows: " No person shall, by intimidation or force, prevent or seek to prevent a person from entering into or continuing in the employment of any person or corporation."

lawful acts it seems to cover only such acts as are prohibited by other parts of the decree, we think it should be omitted.

Inasmuch as the association of the defendants is not a corporation, an injunction cannot be issued against it as such, but only against its members, their agents and servants.

As thus modified, in the opinion of the majority of the court, the decree should stand.            *Decree accordingly.*

HOLMES, C. J.   When a question has been decided by the court, I think it proper, as a general rule, that a dissenting judge, however strong his convictions may be, should thereafter accept the law from the majority and leave the remedy to the Legislature, if that body sees fit to interfere.   If the decision in the present case simply had relied upon *Vegelahn* v. *Guntner*, 167 Mass. 92, I should have hesitated to say anything, although I might have stated that my personal opinion had not been weakened by the substantial agreement with my views to be found in the judgments of the majority of the House of Lords in *Allen* v. *Flood*, [1898] A. C. 1.   But much to my satisfaction, if I may say so, the court has seen fit to adopt the mode of approaching the question which I believe to be the correct one, and to open an issue which otherwise I might have thought closed.   The difference between my brethren and me now seems to be a difference of degree, and the line of reasoning followed makes it proper for me to explain where the difference lies.

I agree that the conduct of the defendants is actionable unless justified.   *May* v. *Wood*, 172 Mass. 11, 14, and cases cited.   I agree that the presence or absence of justification may depend upon the object of their conduct, that is, upon the motive with which they acted.   *Vegelahn* v. *Guntner*, 167 Mass. 92, 105, 106. I agree, for instance, that if a boycott or a strike is intended to override the jurisdiction of the courts by the action of a private association, it may be illegal.   *Weston* v. *Barnicoat*, 175 Mass. 454.   On the other hand, I infer that a majority of my brethren would admit that a boycott or strike intended to raise wages directly might be lawful, if it did not embrace in its scheme or intent violence, breach of contract, or other conduct unlawful on grounds independent of the mere fact that the action of the defendants was combined.   A sensible workingman would not

contend that the courts should sanction a combination for the purpose of inflicting or threatening violence or the infraction of admitted rights. To come directly to the point, the issue is narrowed to the question whether, assuming that some purposes would be a justification, the purpose in this case of the threatened boycotts and strikes was such as to justify the threats. That purpose was not directly concerned with wages. It was one degree more remote. The immediate object and motive was to strengthen the defendants' society as a preliminary and means to enable it to make a better fight on questions of wages or other matters of clashing interests. I differ from my brethren in thinking that the threats were as lawful for this preliminary purpose as for the final one to which strengthening the union was a means. I think that unity of organization is necessary to make the contest of labor effectual, and that societies of laborers lawfully may employ in their preparation the means which they might use in the final contest.

Although this is not the place for extended economic discussion, and although the law may not always reach ultimate economic conceptions, I think it well to add that I cherish no illusions as to the meaning and effect of strikes. While I think the strike a lawful instrument in the universal struggle of life, I think it pure phantasy to suppose that there is a body of capital of which labor as a whole secures a larger share by that means. The annual product, subject to an infinitesimal deduction for the luxuries of the few, is directed to consumption by the multitude, and is consumed by the multitude, always. Organization and strikes may get a larger share for the members of an organization, but, if they do, they get it at the expense of the less organized and less powerful portion of the laboring mass. They do not create something out of nothing. It is only by divesting our minds of questions of ownership and other machinery of distribution, and by looking solely at the question of consumption, — asking ourselves what is the annual product, who consumes it, and what changes would or could we make, — that we can keep in the world of realities. But, subject to the qualifications which I have expressed, I think it lawful for a body of workmen to try by combination to get more than they now are getting, although they do it at the expense of their fellows, and to that end to strengthen their union by the boycott and the strike.