F. S. DUNSHEE, Appellee, v. THE STANDARD OIL COM-
PANY ET AL., Appellants.

**Unfair competition:** MALICE: DAMAGES.  An act which is legally
1  right when done without malice may become legally wrong when
done maliciously, wantonly and without reasonable cause.  Thus
one engaged in trade may lawfully indulge in the sharpest com-
petition with those in like business and may use any fair means
to secure trade, yet when he acts with a malicious intent to in-
flict injury upon his rival's business his conduct becomes illegal,
and he can be compelled to respond in damages if injury results.
In this action plaintiff was a retailer of oil, purchasing his supply
originally from defendant, a wholesaler, but later began purchas-
ing in part elsewhere.  Defendant thereupon went into the retail
business under the pretense of competition, but employed such
means as indicated a malicious intent to injure or drive plaintiff
out of business, and is therefore in no position to claim immunity
under rules protecting competition, but is liable in damages for
the injury caused plaintiff.

**Same:** CONFORMITY OF PROOF TO PLEADINGS.  Where the gist of plain-
2  tiff's action was the wrongful injury of his business by unlawful
competition, and not conspiracy to injure it, he was entitled to
recover on proof of the malicious wrong, although there may have
been a failure to prove prior conspiracy.

**Same:** SALES: ORDERS.  The fact that plaintiff's customers displayed
3  cards in their windows when desiring oil would not, in the ab-
sence of a previous understanding, constitute orders for oil, but
amounted simply to an invitation to call and that a sale might be
agreed upon.  But although the display of cards in that manner
did not constitute an order, the destruction or malicious carry-
ing away of the same by defendant was an unlawful interference
with plaintiff's business.

**Same:** EXEMPLARY DAMAGES: INTEREST: PREJUDICIAL ERROR.  Exem-
4  plary damages are allowable in an action for unlawful interfer-
ence with one's business, in addition to actual damages; but
interest thereon is not recoverable.  And where the jury is author-
ized to return exemplary as well as actual damages with interest,
and returns simply a general verdict there is no way the appel-
late court can correct the error except by an order for new
trial.

*Appeal from Polk District Court.*—HON. JESSE A. MILLER,
Judge.

THURSDAY, SEPTEMBER 21, 1911.

ACTION at law to recover damages for unlawful inter-
ference with trade.   Judgment for plaintiff, and defend-
ants appeal.   The plaintiff also appeals, but in the discus-
sion of the case defendants only will be spoken of as ap-
pellants.   *Reversed* and *remanded* for new trial.

*Hewitt & Wright, Carr, Carr & Evans* and *C. L.
Nourse,* for appellants.

*C. C. Cole* and *Dunshee & Haines,* for appellee.

WEAVER, J.—During all the period covered by this
controversy, the Standard Oil Company had been a whole-
sale dealer in oil at the city of Des Moines.   In the year
1893 the Crystal Oil Company (plaintiff's assignor), a
local corporation, entered the retail trade in oil, selling its
goods from tank wagons hauled about the streets, and de-
livered to its customers at their homes.   Its business grew
from year to year until, in 1898, it employed from four
to eight wagons, covering the territory of the city very
generally.   During the period mentioned, the Crystal Com-
pany purchased its supplies from the defendant, but in
1898 it for some reason began to make purchases from
other wholesale dealers.   Trouble at once ensued.  · The
defendant, which, up to that time, had abstained from the
retail trade, proceeded to equip itself ·with tank wagons,
teams, and drivers substantially equal in number to those
of the Crystal Company, and began· active solicitation for
the patronage of the "ultimate consumer."   At the end of
some months of strife, the Crystal Company abandoned
the contest and quit the business at a loss, claiming to

have been driven out by the tactics of its rival. The plaintiff, as assignee of said company, brings this action for damages, alleging a conspiracy between the Standard Oil Company and its managers, agents, and employees to ruin the business of said Crystal Company, and setting forth wrongful acts done in pursuance of such conspiracy by which said company's business was destroyed. To the petition as at first filed, the defendant demurred, and a ruling was entered sustaining the demurrer, but no judgment was entered thereon and the cause was allowed to sleep in that condition for a period of six years, when plaintiff filed an amended and substituted petition. Defendant's motion to strike the last pleading was overruled. Upon this ruling error is assigned. We think, however, that the amended petition was not a mere repetition of the pleading demurred to, and the trial court rightfully refused to strike it. It was not as specific as could well have been required, and may have been open to a motion for a more definite statement, but it was not vulnerable to the objection made and relied upon.

I. Upon the issues of fact, we shall attempt no general review of the testimony. For present purposes it is enough to say that the case as made by the plaintiff tends

**1. Unfair competition: malice: damages.** strongly to show that defendant installed its scheme of retail distribution of oil in the city of Des Moines not for the purpose of establishing a retail trade, but as a mere temporary expedient to drive out the Crystal Company, and that, this being accomplished and having the field to itself, it withdrew its wagons and drivers, and gave its whole attention to its wholesale business. In the prosecution of its business, the Crystal Company was accustomed to supply its customers with cards to be displayed from a window or other conspicuous place, indicating a desire to purchase oil and inviting the distributor to stop and furnish the needed supply. The evidence further tends to show that when the

Standard entered the field its drivers were directed to give special attention to the Crystal Company's "green cards," and that, at the outset at least, there was little or no attempt to build up a retail trade with the public generally, but to take away or destroy the trade of the Crystal Company. Some of the witnesses say the Standard's drivers would make it a point to get in advance of the Crystal's wagons, and wherever a green card was displayed would stop and make the sale if possible, sometimes permitting the buyer to suppose that he or she was dealing with a Crystal agent, and in other cases appropriating or carrying away the Crystal's cards. The Standard's hand in these efforts was not disclosed to the public. The drivers were instructed to do business ostensibly as independent dealers, driving their own wagons, none of which were marked with the Standard's name, though in fact the outfits were furnished and all expenses paid by it, and the entire business was carried on under the secret management of its agent, who held frequent meetings with the drivers, urging them to "go after the green cards," to "hustle the green cards," to "go after the Crystal Oil Company," and at the same time cautioned them to "keep quiet" about the real ownership and management. It is further testified that when the Crystal Company had been eliminated the manager in charge had a final meeting of the drivers at his residence, where he said, "The fight is over and we have bought them out." Plaintiff also shows that defendants' movement in the matter followed closely upon the Crystal Company's exercise of its right to purchase part of its oil from another dealer, and its refusal to yield to the Standard's insistence that it wanted "all or none" of the Crystal's trade. In short, the record as a whole is sufficient to justify the inference that the real end sought to be accomplished was to bar or exclude from the retail trade one who would not give the Standard Company, as a wholesale dealer, its exclusive patronage. The

defendants take issue upon the charge as thus preferred, but the jury could properly find the facts to be as above outlined.

As we understand appellants' contention, it is that their conduct did not transgress the bounds of legitimate competition, and that so long as they kept within this limitation the question of the alleged malice or motive inspiring their acts is wholly immaterial. Cases involving the question thus suggested have frequently arisen, both in this country and in England, and there is much confusion in the expressions of judicial opinion thereon. Many authorities may be found holding without apparent qualification or exception, that the law takes no account whatever of motives as constituting an element of civil wrong. In other words, if a man do a thing which is otherwise lawful, the fact that he does it maliciously and for the express purpose of injuring his neighbor affords the latter no remedy at law. Such is the net effect of *Raycroft v. Tayntor*, 68 Vt. 219 (35 Atl. 53, 33 L. R. A. 225, 54 Am. St. Rep. 882); *Jenkins v. Fowler*, 24 Pa. 308, and others of that class. If this be the correct view of the law, a man may excavate the earth near the boundary of his own land for the mere purpose of seeing the foundation of the house of his neighbor slide into the pit thus prepared for it; he may dig through his own soil to the subterranean sources of his neighbor's spring or well and divert the water into a ditch, where it will serve no purpose of use or profit to himself or anyone else; if a banker or merchant, he may punish the blacksmith who refuses to patronize him by temporarily establishing a shop on the next lot and hiring men to shoe horses without money and without price, until he has driven the offending smith to come to his terms or to go out of business; and if a farmer, dependent upon a subterranean supply of water for the irrigation of his soil or watering of his live stock, he may contrive to ruin his competing

neighbor by wasting the surplus not reasonably required for his own use. The laws of competition in business are harsh enough at best; but if the rule here suggested were to be carried to its logical and seemingly unavoidable extreme, there is no practical limit to the wrongs which may be justified upon the theory that "it is business." Fortunately, we think, there has for many years, been a distinct and growing tendency of the courts to look beneath the letter of the law and give some effect to its beneficent spirit, thereby preventing the perversion of the rules intended for the protection of human rights into engines of oppression and wrong.

It is doubtless true that under many circumstances an act is legally right and defensible without regard to the motive which induces or characterizes it; but there is abundance of authority for saying that this is by no means the universal rule, and that an act which is legally right when done without malice may become legally wrong when done maliciously, wantonly, or without reasonable cause. In *Panton v. Holland,* 17 Johns. (N. Y.) 92 (8 Am. Dec. 369), it is stated as a general rule that, "In the exercise of a lawful right, a party may become liable to an action where it appears that the act was done maliciously." See, also, *Greenleaf v. Francis,* 18 Pick. (Mass.), 117; *Chesley v. King,* 74 Me. 164 (43 Am. Rep. 569); *Flaherty v. Moran,* 81 Mich. 52 (45 N. W. 381, 8 L. R. A. 183, 21 Am. St. Rep. 510); *Sankey v. St. Marys,* 8 Mont. 265 (21 Pac. 23); *Harbison v. White,* 46 Conn. 106; *Stillwater v. Farmer,* 89 Minn. 58 (93 N. W. 907, 60 L. R. A. 875, 99 Am. St. Rep. 541); *Ohio Oil Company v. Indiana,* 150 Ind. 698 (58 N. E. 1124; *Barclay v. Abraham,* 121 Iowa, 619. The same principle has been frequently applied in the decision of trade and labor controversies, though not without other instances in which it has been repudiated. See *People v. Petheram,* 64 Mich. 252 (31 N. W. 188); *Walker v.*

*Cronin,* 107 Mass. 555; *Van Horn v. Van Horn,* 52 N. J.
Law, 284 (20 Atl. 485, 10 L. R. A. 184); *Hawarden v.
Coal Co.,* 111 Wis. 545 (87 N. W. 472, 55 L. R. A.
828); *Graham v. Railroad Co.,* 47 La. Ann. 214 (16
South. 806, 27 L. R. A. 416, 49 Am. St. Rep. 366);
*Tuttle v. Buck,* 107 Minn. 145 (119 N. W. 946, 22 L.
R. A. (N. S.), 599, 131 Am. St. Rep. 446); *Plant v.
Woods,* 176 Mass. 492 (57 N. E. 1011, 51 L. R. A. 339,
79 Am. St. Rep. 330); *Barr v. Council,* 53 N. J. Eq.
101 (30 Atl. 881); *Toledo, etc., Ry. Co. v. Penn. Co.*
(C. C.), 54 Fed. 730 (19 L. R. A. 387); *Stevens v.
Kelly,* 78 Me. 445, (6 Atl. 868, 57 Am. Rep. 813); *Pur-
ington v. Hinchcliffe,* 219 Ill. 159 (76 N. E. 47, 2 L.
R. A. (N. S.) 824, 109 Am. St. Rep. 322).

In the *Van Horn* case, *supra,* the court says: "While
a trader may engage in the sharpest competition with
those in like business by holding out extraordinary induce-
ments, . . . yet, when he oversteps that line and com-
mits an act with the malicious intent of inflicting injury
upon his rival's business, his conduct is illegal, and if
damage results from it the injured party is entitled to
redress. Nor does it matter whether the wrongdoer effects
his object by persuasion or by false representation. The
court looks through the instrumentality or means used to
the wrong perpetrated with the malicious intent and bases
the right of action on that." Quoting this language in
*Barr v. Council, supra,* the same court adds: "The right
of action depends, then, not so much upon the nature of
the act, as upon the intent with which it is done, always
assuming that injury has attended the doing of it." In
*Parkinson v. Council,* 154 Cal. 581 (98 Pac. 1027, 21 L.
R. A. (N. S.) 550), the court, while reaching the oppo-
site conclusion generally, concedes it to be the law that:
"Any injury to a lawful business, whether the result of
conspiracy or not, is *prima facie* actionable, but may be
defended on the ground that it was merely a lawful effort

of the defendants to promote their own welfare.   To defeat
this plea of justification, the plaintiff may offer evidence
that the acts of the defendants were inspired by express
malice, and were done for the purpose of injuring the
plaintiff, and not to benefit themselves."

Dealing with the perplexities arising in the effort to
sustain, on the one hand, the widest practicable liberty of
men to engage in any and every line of business, and, on
the other, to protect the business of each from wrongful
encroachment or interference by others, the New Hamp-
shire court, after reference to many of the decided cases,
has lately said: "The more recent authorities reason
that, as the right to deal or not to deal with others is
inherent in the idea of Anglo-Saxon liberty, *prima facie*
a man may demand an open market, and, since this is
so, one who interferes with this open market must justify
his acts, or respond in damages.   Thus far the authorities
are uniform, but when they proceed to the determination
of what amounts to a justification they differ widely.   The
cause is not far to seek.   The rule they apply is that of
reasonable conduct; yet they decide each case as though
it involved only a question of law.   In reality, the issue
is largely one of fact, and the result is what would be
expected.   Judges are men, and their decisions upon com-
plex facts must vary as those of juries might on the same
facts.   Calling one determination an opinion and the other
a verdict does not alter human nature, nor make that uni-
form and certain which from its nature must remain varia-
ble and uncertain.   While these cases go too far in what
they decide as questions of law, yet the test they constantly
declare they are applying is the true one.   The standard
is reasonable conduct under all the circumstances of the
case."  *Huskie v. Griffin,* 75 N. H. 345 (74 Atl. 595, 27
L. R. A. (N. S.) 966).   See, also, *Doremus v. Hennesy,*
176 Ill. 608 (52 N. E. 924, 54 N. E. 524, 43 L. R. A.
797, 802, 68 Am. St. Rep. 203); *Horan v. Burns,* 72 N.

H. 93 (54 Atl. 945, 62 L. R. A. 602, 101 Am. St. Rep. 670); *Ertz v. Produce Exchange,* 79 Minn. 140 (81 N. W. 737, 48 L. R. A. 90, 79 Am. St. Rep. 433). As suggested in the foregoing quotation, no definition or standard of reasonable cause can be stated which will insure absolute uniformity or even consistency in the decision of such cases, because the issue presented is in its essence one of fact, and the same facts and circumstances will not always appeal with like effect to the minds of all jurors or of all judges. It is for this reason that, save in those exceptional cases where the case of the plaintiff or the defendant is so clear and undisputable that all fair-minded persons are forced to the same conclusion, controversies of this nature, in a trial at law, are for the jury, and not for the court.

Coming to the case in hand, we may concede to the appellants the undoubted right to establish a retail oil business in Des Moines, to employ agents and drivers, and send them out over the same routes and make sales to the same people with whom the Crystal Oil Company was dealing; but in so doing it was bound to conduct such business with reasonable regard and consideration for the equal right of the Crystal Company to continue its business and to continue supplying oil to such of its customers as desired to remain with it. If, however, there was no real purpose or desire to establish a competing business, but under the guise or pretense of competition, to accomplish a malicious purpose to ruin the Crystal Company or drive it out of business, intending themselves to retire therefrom when their end had been secured, then they can claim no immunity under the rules of law which recognize and protect competition between dealers in the same line of business seeking in good faith the patronage of the same people. And if, under such pretense of competition, defendants maliciously interfered with the business of the Crystal Oil Company in the manner charged, and injury to the latter was

thereby inflicted, a right of action exists for the recovery of damages. It may be conceded that authorities are not wanting to sustain the position that, even though the Standard Oil Company had no intention of becoming a retail dealer in oil in Des Moines, but entered the business of selling oil in this manner temporarily, for the sole purpose of driving the Crystal Company out, it is a matter into which the courts will not inquire; but we think such precedents are out of harmony with fundamental principles of justice, which, as we have said, underlie the law, as well as out of harmony with the later and better considered cases. True, the Standard Company, as a wholesale dealer, would violate no law in offering its product for sale at retail at half price in the territory supplied by the Crystal Company, but such fact, if proven, would have a distinct bearing upon the reasonableness of its methods employed in diverting trade from said company, as well as upon the charge that in interfering between the Crystal Company and its customers the Standard Company was actuated by malice or spirit of wanton assault upon the business of another, who had given it offense.

Of the cases which directly or indirectly sustain this view there are many, but we shall not extend this discussion to make extended reference to them. Sufficiently analogous in fact to illustrate the principle is *Tuttle v. Buck,* 107 Minn. 145 (119 N. W. 946, 22 L. R. A. (N. S.) 599, 131 Am. St. Rep. 446.) There the plaintiff had an established and profitable business as a barber, and defendant, a banker, owned a building which he wished plaintiff to occupy with his shop. This being declined, it was alleged that defendant sought to punish the plaintiff by injuring his trade and driving him out of business. To that end defendant employed other barbers to occupy the shop and entice away the plaintiff's patrons, whom he personally and persistently solicited to no longer employ plaintiff's services, and by these and other wrongful

means did in fact injure plaintiff's business, all of which was done with the sole design of injuring the plaintiff, and not for the purpose of serving any legitimate interest of defendant himself. This was held on appeal to state a good cause of action. Discussing the general rules upon which such rights of action have sometimes been denied, the court says: "It is not at all correct to say that the motive with which an act is done is immaterial, providing the act itself is not unlawful. Numerous illustrations to the contrary will be found in the civil, as well as criminal, law." After adverting to the origin and growth of the rules of the common law, and the gradual adaptation of that system to changing conditions, and pointing out the unsoundness of the proposition that the lawful right to do a thing is not affected by the motives with which it is done, the court adds: "To divert to oneself the customers of a business rival by the offer of goods at lower prices is in general a legitimate mode of serving one's own interests and justifiable as fair competition. But when a man starts an opposition place of business, not for the sake of profit to himself, but regardless of loss to himself, and for the sole purpose of driving his competitor out of business, and with the intention of himself retiring upon the accomplishment of his malevolent purpose, he is guilty of a wanton wrong and an actionable tort. In such a case he would not be exercising his legal right or doing an act which can be judged separately from the motive which actuated it. To call such conduct competition is a perversion of terms. It is simply the application of force without legal justification, which in its moral quality may be no better than highway robbery." We think the doctrine thus stated is a healthful one, the application of which can give ground of complaint to no honest man, and will work injury to no business conducted with due regard to fair and upright dealing. No man entering or carrying on business has any right to demand protection

against fair competition, and if he can not meet it and succeed he must expect to fail, and for losses and injuries resulting the law affords him no remedy. But if competition be "war," in which "everything is fair," or if it be so regarded by those who participate therein, certainly the law will not give that doctrine its sanction. It follows of necessity that the trial court did not err in refusing to direct a verdict in defendants' favor.

II.  In ruling upon the defendants' motion for a directed verdict, the trial court seems to have held or suggested that proof that defendants, in pursuance of their alleged conspiracy, had interfered with contracts made between the Crystal Company and its patrons would give rise to a cause of action, and upon the final submission of the cause it instructed the jury, as a matter of law, that the display of the green cards were orders upon the Crystal Company for the delivery of oil, and that a malicious interference by the defendants with the filling of such orders by the Crystal Company would be a wrong for which an action would lie, if such interference was in pursuance of a conspiracy between the defendants to injure the business of said company. Of this instruction both parties complain, and we are inclined to the view that it can not be sustained as broadly as stated.

Referring, first, to plaintiff's exception, we think the proposition last stated places a too narrow construction upon the rule of law here applicable, in that it seems to require, not only the proof of a malicious wrong and injury therefrom, but further proof that such wrong was done in pursuance of a conspiracy previously formed. The gravamen of the charge made is not the alleged conspiracy, but the wrong done to the plaintiff's assignor, and if the wrong is sufficiently established by the evidence a recovery may be had by the party injured, although there be a failure of proof of the conspiracy.

2. SAME: conformity of proof to pleadings.

The defendants' exception to the instruction is that the display of the cards by the Crystal Company's customers can not be said, as a matter of law, to constitute orders upon that company. The point is well made. True, if there were some prior arrangement or agreement with a customer by which the display of a card would evidence a definite order, such act might be as effective as the sending of a written request to the company for a stated quantity of oil at a definite price; but the record does not disclose such a state of facts, and we think that, so far as the evidence goes, the display should be treated rather as a notice or invitation to the Crystal Company's drivers, observance of which on their part would lead to a sale.

3. SAME: sales: orders.

But we are not of the opinion that an actual, contract must exist before wanton interference by a third party would amount to a legal wrong. For illustration, if, instead of displaying cards, it was the habit of the Crystal Company's customers to communicate their wants by messenger or by telephone, and defendant in the zeal of competition should maliciously intercept the messenger and induce him to reveal the nature of his errand, or should maliciously tap the telephone wire and with the advantage thus acquired should rush their wagons to the front and deprive the company of the sales which it would otherwise have made, we think no advocate of the widest allowable license of unrestricted competition would contend that this would not constitute a legal wrong, even though the conduct complained of did not in fact amount to an interference with an existing contract. For the same reason we think the defendants could not, upon the plea of competition, justify any malicious interference with existing contracts or orders of the Crystal Company, or interfere with or remove the cards posted as an invitation or notice to said company for the delivery of oil; but we think the court can not assume to say, as a matter of

law, that the display of such cards constituted in itself either a contract or order. It may be open to some question whether the error of the instruction was of a prejudicial character, but, taking the record as a whole, we think it the safer conclusion to solve that doubt in the appellants' favor.

III.   The trial court correctly instructed the jury that, if plaintiff had established his right to recover because of the wrongful and malicious acts of the defendants as charged, he was entitled to a verdict for the actual damages so sustained by the Crystal Company, to which sum the jury were at liberty to add exemplary damages. It also, in another connection and in a general way, told the jury that, if found entitled to recover, plaintiff should also be allowed interest on the damages so sustained. The jury returned a general verdict for plaintiff for a sum stated in round numbers, but not indicating what part, if any, of said amount was allowed as exemplary damages. Neither does it indicate how much of the verdict is for interest, nor on what part of it interest was computed. The point is made that interest is not allowable upon exemplary damages, and as there are no data or basis from which to determine what part of the verdict represents damages of that kind there is no way in which the court can cure or remove the prejudice. We see no way to avoid the force of this objection. It may be that little or no allowance was made for exemplary damages; it may also be that no interest was computed; but there is nothing by which to determine that fact. It may also be that much the larger part of the verdict was for exemplary damages, and if so, and interest was computed thereon (as the jury under the court's charge may have felt authorized to do), the amount of the recovery must have been very materially increased by that item. Interest as such upon exemplary damages is not recoverable. 16

4. SAME: exemplary damages: interest: prejudicial error.

Am. & Eng. Ency. Law (2d ed.), 1031. The error is one which is not amenable to correction in this court, except by an order for a new trial.

The points made by counsel and already discussed are sufficient to dispose of the appeal, and we can not prolong this opinion to consider other questions raised, except to say we discover no error in the rulings to which exceptions are taken.

For the reasons stated, the judgment of the district court is reversed, and the cause remanded for a new trial. —*Reversed.*