HOWARD, Respondent v. AMERICAN OIL COMPANY, Appellant

(144 N.W.2d 737)

(File No. 10224.  Opinion filed September 2, 1966)

Rehearing denied November 2, 1966

**Martens, Goldsmith, May & Porter,** Pierre, for plaintiff and respondent.

**Stephens, Riter, Mayer & Hofer,** Pierre, for defendant and appellant.

BIEGELMEIER, Judge.

Plaintiff, a lessee of a service station, brought this action for damages against defendant lessor for claimed interference with his business relations and for breach of the covenant of quiet enjoyment implied in the lease. Defendant appeals from a judgment for plaintiff for actual and punitive damages. We reverse.

Defendant company had commenced an action for possession of the service station in September 1963 which resulted in a verdict and judgment for the present plaintiff who remained in possession and was in possession of the property at the time of trial of this action in August 1964. Other facts will be stated in the course of the opinion. Plaintiff's claims and some instructions of the trial court will first be discussed as the disposition of these items has some bearing on another issue.

## I.

Plaintiff's complaint states the causes of action in three separate counts. Count 1 alleges the plaintiff was lessee of a gasoline service station under a lease dated August 30, 1962; that defendant lessor maliciously sought to coerce plaintiff into abandoning the premises and interfered with his use and occupancy thereof by harrassing his employees, interfering with his private business relations, with his bank and other persons for the purpose of impairing plaintiff's credit and threatening to retake the premises, and a loss of $7,500 actual damages to his business good will, reputation and his use and operation of the leased premises.

Count 2 realleges Count 1 and then alleges defendant's acts interfered with plaintiff's quiet and peaceable possession of the leased premises with actual damages of $7,500. Count 3 realleges the foregoing counts and that such conduct was oppres-

sive and malicious and demands exemplary and punitive damages of $15,000. While the complaint alleges damages of $30,000, the prayer for relief requested $7,500 actual damages and $15,000 punitive damages.

The charge to the jury stated plaintiff "claims that defendant breached a covenant of quiet enjoyment under a lease between them" and outlined the claims set out in Count 1, with some additions from the evidence as to coercive credit practices not therein alleged, with no mention of any amount of damages as to this claim; it then stated his claims in the second count and alleged defendant's malicious acts "interfered with his quiet and peaceable possession of the leased premises' resulting in plaintiff's damage of $7,500; this was followed by a statement of the third claim of $15,000 punitive damages. The situation therefore seems somewhat confused. Were there three causes of action or two causes of action? Defendant in this court has treated the complaint as containing three causes of action—one for damages for breach of the covenant of quiet enjoyment, one for business interference, and a third for exemplary damages. Plaintiff's brief (in a different order) states the action was brought for damages for defendant's interference with his business relations and defendant's breach of the covenant of quiet enjoyment implied in the lease in force between the parties and for the $15,000 punitive damages.

By Instruction 6 the trial court advised the jury that if it found defendant maliciously interfered with plaintiff's lawful possession and operation of the station and his quiet enjoyment of the premises and the plaintiff was damaged thereby, the plaintiff was entitled to a verdict for loss of customers, employees, good will and profits of his business not exceeding $7,500. Plaintiff's counsel at the trial indicated his understanding of the causes of action by stating in an offer of proof that certain claimed damages were attorneys' fees and expenses incurred as a result of "unlawful interference in his lease (and?) possession" of the station by defendant in the forcible entry and detainer action "made necessary by the breach of the covenant of quiet enjoyment" of the lease.

290

The trial court's Instruction 11 was:

"You are instructed that for the defendant to be guilty of a breach of the covenant of quiet enjoyment, by the failure or omission to perform some act, or acts, you must first find that there was a duty upon the defendant to perform such act, or acts, under its lease with the plaintiff. The lease in evidence in this case carries with it an implication in law that the defendant lessors would refrain from acts voluntarily undertaken which would substantially impair the character and value of the leased premises."

In argument to the jury plaintiff's counsel, as he was then entitled to do, read this instruction with the comment "we have recounted to you the numerous acts they (defendant's employees) have done. Interfered wrongfully with his possession of those premises". Later he argued: "Mr. Howard had contractual rights under the lease. He had a contractual right they would not interfere with his business * * * with his beneficial enjoyment of the premises". Defendant had objected to Instruction 11 and the instructions as a whole for the reason the complaint included three causes of action of which the first two were ambiguous as to their theory unless they be accepted as breach of a covenant of quiet enjoyment and malicious interference with business relations, with an attempt to double (couple?) the former, a contractual cause of action, with an action of tortious interference with the possessory use of the property; that the instructions did not clearly set out or separate the two distinctly and the jury could therefore award exemplary damages as part of the breach of covenant of quiet enjoyment. Defendant's requested Instruction 5 was to the effect that commencement of an action to recover possession was not a breach of the covenant of quiet enjoyment; the court denied this request.

■ ■ The mere commencement of legal proceedings against a lessee relating to his right to possession is not sufficient to constitute a breach of a covenant for quiet possession. 51 C.J.S. Landlord and Tenant § 323; Black v. Knight, 176 Cal. 722, 169 P. 382; L.R.A. 1918C, 319 and Annotation, p. 323. In order to

make one liable for the institution of such a suit, it must have been with malice and without probable cause. Actual malice and bad faith are never presumed. McIntyre v. Meyer, 81 S.D. 417, 136 N.W.2d 351.

The lease involved was for a term commencing September 1, 1962 and ending August 31, 1963 with "No subsequent successive terms". Whether the jury's verdict for defendant was based on an oral extension of the lease or some other reason does not appear from this record; however, there is no evidence to show either malice or lack of probable cause· existed in September 1963 when the forcible entry action was commenced. That the jury could find for plaintiff because of defendant's unsuccessful forcible entry action appears also from Instruction 5 which permitted plaintiff here to recover if he established he was in lawful possession of the premises and operating a business thereon, (though no time was stated there was no issue as to this) and defendant maliciously and without justification or excuse did intermeddle and interfere with his business and "his quiet enjoyment of said premises."

As to this malice used in this instruction the court advised the jury it did not mean actual or express malice in the sense of ill will or spite, but rather legal or technical malice that is the intentional doing of a harmful or injurious act without justification or excuse.

■■ As we have indicated defendant had not breached the lease by bringing its unsuccessful forcible entry action and it was reversible error for the court to include reference to it in the instructions and refuse the request noted. Nor does Exhibit A, being departmental correspondence of defendant, add sufficient proof to make defendant's law action wrongful. Defendant had, by letter of August 23, 1963 notified plaintiff his lease was cancelled August 31, 1963 and to deliver up possession of the premises and defendant's equipment of that date. Plaintiff telephoned defendant's District Manager and told him his interpretation of the lease was it ran for another year; the manager told plaintiff he had been informed by the company's legal department that plaintiff would have to move. Later three of defendant's representa-

tives called on plaintiff and in a visit over coffee showed Exhibit A to him; this appears to be from the Minneapolis office and is addressed to the District Manager, one A. B. Iverson. It states "the attorney for Mr. Howard apparently has misinterpreted the lease" indicating Howard had advised them he had consulted an attorney. The letter explains the writer's view the lease will expire August 31, 1963, and then states "You will be within legal grounds if you enter these premises by removing the lock, if necessary, and taking inventory before a Notary Public. * * * If the attorney for Mr. Howard has any questions, you may have him call this office directly." The parties not including Iverson then went to the office of Howard's attorney where they had further discussion. At that time Howard owed a Pierre bank about $9,000 secured by a duly filed chattel mortgage on his service station equipment worth about $5,500. Defendant's representatives later called at the bank and advised it the company planned to terminate Howard's lease and lease the station to some other person, at which time Exhibit A was shown to a bank officer. Defendant's witness states the reason for the call was to indicate the company's intentions so the bank could take such steps as it deemed proper to protect the mortgaged property or its lien in the event the new station lessee desired to buy it from Howard as was customary. Plaintiff imputes a different reason for showing the letter to plaintiff and the bank officer, that it was to intimidate and put pressure on plaintiff, both directly and through the bank, to remove from the premises. But the answer to those claims as to the bank is the bank officer as plaintiff's witness testified defendant's agents told him they knew the bank held the mortgage on the equipment and they were informing it so they could be aware of the proposed change and see its interests were adequately protected in the event of the change and possible sale to the incoming operator; that he tried to discourage and delay the change and, after talking to plaintiff and his attorney, informed defendant plaintiff "planned on not getting out". As to plaintiff, he had legal counsel employed and with whom he consulted during this time, and who was present at the discussion mentioned; he did not remove from the premises nor did defendant take any steps to remove him except the forcible entry action.

The letter openly invited plaintiff's attorney to call the writer and the subsequent actions of defendant's representatives in discussing the situation with plaintiff, his attorney and the bank officers are more consonant with good faith than bad faith and as bad faith and malice are not presumed, the evidence is insufficient to support it on the issue of interference with plaintiff's quiet and peaceable possession. There was therefore no interference with plaintiff's possession or breach of covenant of quiet enjoyment.

Plaintiff cites Kuiken v. Garrett, 243 Iowa 785, 51 N.W.2d 149, 41 A.L.R.2d 1397, and Platou v. Swanton, 59 N.D. 466, 230 N.W. 725; both are distinguishable. The landlord in Kuiken during four months caused ten separate notices to be served on the tenant and filed four verified petitions in forcible entry and detainer which were dismissed. The court stated the "repeated" notices and actions may support an inference of malice. In Platou, elevator service was discontinued and the hall to a doctor's office was obstructed during extended remodeling of the building; these were physical interferences with facilities of ingress and egress to plaintiff's office. Neither situation existed here.

## II.

Defendant's motions for directed verdicts at the conclusion of plaintiff's evidence and renewed at the close of the evidence raise the question of insufficiency thereof to sustain the verdict. The service station lease provided plaintiff pay defendant $10 a month and 1.6 cents per gallon on all gasoline delivered to the station for resale. As set forth in his brief plaintiff's claim is based on the contention defendant interfered with his employees, his banker and his customers. The meetings relative to the bank about the property on which it had a mortgage have been discussed. There was no evidence any customer was discouraged from or inconvenienced in patronizing plaintiff and though there is serious doubt of proof of damages[1] (see Platou v. Swanton, 59 N.D. 466, 230 N.W. 725, supra,) we do not reach

---

1. For instance, it appeared during part of 1964 plaintiff's retail prices on gasoline were 1 cent a gallon higher than other Standard Oil or major company stations.

that question and will examine the evidence to inquire if it shows further acts creating legal liability.

The evidence is voluminous; to condense it is difficult without seeming to omit details. After defendant's forcible entry action, plaintiff's testimony showed and he bases his claim to recover on defendant's conduct which, after indicating his claim and testimony offered to support it, the undisputed or preponderance of the evidence will then be stated.

(Tires) Plaintiff had previously purchased a carload of tires each year; he was not solicited by a salesman as theretofore nor a sign kit for them; he bought none for 1964 and not having a stock of defendant's Atlas tires, which were nationally advertised as were its other Atlas products, including batteries and antifreeze, he was unable to adjust defendant's tires under its liberal adjustment policy; he was "not invited" to dealers' meetings to promote sales in 1964 nor included in competition for advertising, cleanliness or service; nor was he "given opportunity" to participate in employee incentive programs; he was not given "encouragement" for tire sales in 1964 as before, his picture being omitted from two tire advertisements published by defendant; generally as to tires, batteries and accessories a company salesman had formerly made two calls a month; after September 1963 no calls in reference to sales were made and he was not given "any opportunity to buy" such products from them. (Antifreeze) Before 1964 he sold Atlas Perma-Guard antifreeze guaranteed to be replaced free of charge during a season; he was not "able to purchase" it in 1964 nor furnished tags to be used with such sales; he could have purchased Frost-Guard, the same permanent type at the bulk plant, but did not do so. (Batteries) He was not "able to buy any of the Atlas batteries in 1964" nor did he receive a sign kit advertising them and used by other stations, as were some other similar signs advertising Atlas products and service. (Sign kit) He was never "given a chance to buy" the 1964 sign kit, which cost $59 either for cash or any other way.

It is undisputed plaintiff had purchased Atlas products from defendant on credit and had become indebted to defendant for

over $8,000. In 1961 a plan was then put into effect to pay this debt by adding two or three cents per gallon over the wholesale price for every gallon delivered to the station and crediting this to the debt, which plan continued until the summer of 1963 when it was terminated and the balance of the debt was $4,500. Plaintiff, however, then owed the Pierre bank $9,000 secured by a chattel mortgage of record on equipment worth only $5,500. After being asked to pay something on the account and being unable to do so, plaintiff was notified and understood henceforth defendant would no longer sell tires, batteries or other accessories to him on credit and he would have to pay cash for them. Plaintiff's equivocal testimony was he was not "given any opportunity" or "encouragement", or "not able to purchase", or "buy" defendants products without a statement of fact showing a wrongful act by defendant is conclusional and too indefinite and uncertain to fasten liability on defendant. An example is his testimony that no "sales" calls were made after September 1, 1963 when it was not disputed the local salesman made some visits to the station as late as May 1964 when plaintiff testified he was told by a former trainer defendant had no desire to sell anything to him, but if he wanted anything, to call the bulk plant or their attorney. He knew the attorney and dealt with the bulk plant every day when he bought gasoline.

Plaintiff was not required by his lease to buy any of defendant's products nor was he in any way restricted in products he could handle or sell at the station. Indeed, the lease expressly provides and permits such freedom of purchasing and selling. The only limitation is if plaintiff discontinue sale of gasoline supplied by defendant, he shall remove all signs identifying products of defendant. So plaintiff was at liberty to deal with any supplier at his discretion. Defendant was under no obligation to invite plaintiff to its sales promotion meetings as plaintiff for several months had sold tires other than those sold by defendant. He received literature about various tire sale campaigns, but did not contact any sales representatives to participate in them. Further, defendant did not at any time refuse to sell its products to plaintiff. His testimony was:

"Q Is it your testimony, Mr. Howard, that the salesman for the American Oil Company * * * have refused to sell you Standard Oil products? Is that your testimony?

"A They have not sold me anything.

"Q I'm asking you is it your testimony they have refused to sell you products?

"A I don't understand your question. * * *

"Q Well, I think my question was, Mr. Howard, were you ever denied the purchase of products when you offered to pay cash for them?
(Objection Overruled)

"A No."

Defendant has an absolute right to require cash or refuse to sell to plaintiff and omit him from its various sales meetings or advertising plans and promotions and incurred no liability for so doing.

(Maintenance)) The letter "N" in the "STANDARD" sign on the station was out of line three or four months when defendant's maintenance man residing in a different city made periodic trips every three or four weeks to repair its buildings and equipment. Plaintiff did not report this nor complain to anyone about it until this trial, he "Just let it sit there". Two pumps out of six at the station were out of order a week before the trial of this action. Plaintiff reported this to the bulk station operator, who said he would get them repaired; one was repaired within a week and the other needed parts not immediately available. In the meantime two seldom used pumps on a lower level were moved to the place of the defective pumps. The lease required plaintiff to keep the buildings and equipment in repair, so repair was his obligation. See also SDC 38.0410.

(Employee Coon) Defendant entered a lease of this station to one Kusler commencing September 1, 1963, when it assumed plaintiff's lease ended. Mail from defendant company to Kusler's

Standard was delivered to the station plaintiff was operating as it contained that street and number address; Kusler arrived in Pierre with a truck and station supplies expecting to take over the station as lessee. Plaintiff asserts these actions and others which gave publicity to defendant's efforts to recover possession of the station wrongfully caused his employees anxiety and one of them, a nighttime employee, to quit his job. Except for calling defendant's salesmen for cross-examination, the evidence of plaintiff consisted of his testimony and that of the bank officer heretofore mentioned. The night employee was a witness for defendant. He testified he quit his employment with plaintiff because he could better himself for money and hours worked — "Shorter hours and more pay" as he put it, and plaintiff was slow on his pay and losing business. He was aware defendant wanted plaintiff to vacate the premises as he learned it from the certified notice plaintiff received; he could learn of this by plaintiff voluntarily showing it, and knowledge of the forcible entry action was a public record of the exercise of defendant's legal privilege; the evidence preponderates that this employee quit for the reasons he gave and not for any wrongful act of defendant. That the circuit court had entered judgment dismissing defendant's forcible entry action October 9, 1963 and defendant quit October 26, 1963 supports Coon's testimony.

Eagle Glass & Mfg. Co. v. Rowe, 245 U.S. 275, 38 S.Ct. 80, 62 L.Ed. 286, an action where defendants were alleged to be directly soliciting and pressuring miners to quit their jobs and join the union and others to keep their jobs and join the union contrary to their employment contract and Wear-Ever Aluminum, Inc. v. Townecraft Industries, Inc., 75 N.J.Super. 135, 182 A.2d 387, where defendant's competitors were directly enticing a whole sales crew, at mass meetings conducted by another former employee, to leave their employer who had trained them cited by plaintiff in his brief as to employee Coon are fact situations markedly different from the case at bar. The same may be said of the cases of Tuttle v. Buck, 107 Minn. 145, 119 N.W. 946, 22 L.R.A.,N.S., 599, and Dunshee v. Standard Oil Co., 152 Iowa 618, 132 N.W. 371, 36 L.R.A.,N.S., 263 cited in oral argument. In the former, the complaint alleged defendant banker in a

small town opened and fitted up a barber shop, hired two barbers on a salary basis and used his prestige and by false and malic- ious accusations of plaintiff and threats urged persons not to em- ploy plaintiff for the sole purpose of driving plaintiff out of bus- iness, held to state a cause of action and in the latter, defendant wholesaler of oil products, after losing plaintiff retailer as a customer started up a competitive retail business to put plaintiff out of business, using tactics to solely and fraudulently solicit plaintiff's customers and not the general public; when it sold out to defendant the latter discharged all the help and quit the retail venture stating "The fight is over". On the general subject see Prosser, Law of Torts, Third Edition, § 124. We have tried to deal with all plaintiff's contentions and evidence not overlooking such items as the failure of defendant to have a representative call on the station to measure the attendants for uniforms.

▮ Our conclusion is the defendant's motion for a directed verdict dismissing plaintiff's action should have been granted and that part of the judgment appealed from which entered judgment for plaintiff on the jury's verdict is reversed.

RENTTO, P. J., and ROBERTS and HOMEYER, JJ., concur.

HANSON, J. dissent.

HANSON, Judge (dissenting).

In my opinion there is competent evidence in the record, viewed **in the light most favorable to plaintiff** which supports the verdict.